Tyler Green, Utah Bar No. 10660
Consovoy McCarthy, PLLC
222 S. Main Street, 5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
Attorney for Plaintiff Jonathan Dunn

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| JONATHAN DUNN,<br><br>*Plaintiff,*<br><br>v.<br><br>DELTA AIR LINES, INC.; ROBERT BANISH; KEVIN MILLER; BRIAN CINK; AIR LINE PILOTS ASSOCIATION, INTERNATIONAL; RICHARD HARPER; and ADAM BRADLEY,<br><br>*Defendants.* | **COMPLAINT**<br>**JURY DEMANDED**<br><br>Case No.  2:24-cv-967 |

Jonathan Dunn brings this complaint for declaratory relief, injunctive relief, and damages against Delta Air Lines, Inc., Robert Banish, Kevin Miller, Brian Cink, Air Line Pilots Association, International, Richard Harper, and Adam Bradley ("Defendants"). Mr. Dunn alleges as follows:

### INTRODUCTION

1.      Jonathan Dunn is a decorated Air Force officer, pilot, and civil aviator with over 25 years of experience. While Dunn was working for Delta Air Lines, his supervisor Robert Banish falsely accused him of a crime. Together with other Delta officials, Banish used the false accusation to get Dunn fired and, worse, to instigate and continue a criminal prosecution against him that carried a maximum sentence of life imprisonment.

2.      Thankfully, Dunn exposed Banish's lie. On the eve of trial, Dunn obtained exculpatory evidence that showed Banish had changed his story and lied to prosecutors about what happened.

Once Dunn revealed this evidence, the government immediately dropped the charge "for good cause [and] in the interest of justice." Meanwhile, Dunn lost his pilot's license, his current employment, and all prospects of future employment in commercial aviation. The stigma of the prosecution and associated national media attention continues to harm him today. Mr. Dunn now brings this action against those responsible for this unjustified and unlawful conduct.

3.      Banish's false accusation stemmed from a conversation he and Dunn had while co-piloting a Delta flight into Salt Lake City. Dunn didn't realize at the time, but over the course of their three-day assignment—the first time the two had ever worked together—Banish came to dislike Dunn personally. As the plane approached Salt Lake City Airport, Banish and Dunn bantered about a non-emergency medical event that happened earlier in the flight. Banish joked that he might divert the plane to a small mountain airport in Grand Junction, Colorado, that was nearby—a clearly facetious remark. In response, Dunn "jokingly suggested" (in Banish's words) that Dunn would use his service pistol to stop Banish from doing so.

4.      Banish knew that Dunn was joking. He repeatedly said so to the FBI on a recorded line just days after the incident. But over the next two years, Banish told different versions of this story to federal investigators and prosecutors, each time painting Dunn in an increasingly worse light. After the FBI investigation closed without prosecution, Banish told different federal officials that he "didn't know" whether Dunn was joking. Dunn was indicted several months later, and Banish changed his story once again. This time, he told prosecutors he "did not" consider Dunn's comments a joke and was "concerned [that] if [he] diverted to Grand Junction, [Dunn] would use his weapon to relieve [him] of command." When prosecutors interviewed Banish again two months later—with a Delta attorney attending remotely—he apparently told the government he felt threatened and believed Dunn was attempting to take over the cockpit using his firearm. He also falsely told the prosecutor that Dunn's comments interfered with his decision making, even though he had insisted in his interview a

2

year earlier they had not. But for these false statements, the government would have dismissed the case—as it did immediately after Dunn exposed Banish's lie.

5.      The lie gathered so much traction because Banish had the support of Delta officials and representatives of ALPA, the pilots' union, in pursuing the criminal case against Dunn. Delta's Salt Lake City Chief Pilot Kevin Miller and Regional Chief Pilot Brian Cink—the officials in charge of all Delta pilots in Salt Lake and the surrounding region—used Delta's disciplinary proceedings to elicit statements from Dunn that the government construed as incriminating. Cink even agreed to serve as an expert witness for the government in Dunn's prosecution and was apparently prepared to offer false testimony on several probative issues. Rick Harper and others at ALPA supported the scheme despite owing Dunn a duty of fair representation under federal law.

6.      This is a paradigmatic case of malicious prosecution. Banish and the other Defendants started the criminal case against Dunn, and they could have stopped it at any time. All they had to do was tell the truth.

7.      In committing these unlawful acts, Defendants also defamed Dunn and breached the federal duty of fair representation that he is owed.

## PARTIES

8.      Plaintiff, Mr. Jonathan Dunn, is a Lieutenant Colonel in the United States Air Force Reserve. Dunn worked as a commercial pilot for Delta Airlines from 2015 until 2022. During his employment with Delta, Dunn was a member of Defendant Air Line Pilots Association, International. Dunn is domiciled in South Dakota.

9.      Defendant Delta Air Lines, Inc. ("Delta") is a commercial airline company. It is incorporated in Delaware and maintains its principal place of business in Georgia.

10.     Defendant Robert Banish is a commercial pilot for Delta. He is domiciled in Utah.

11.     Defendant Kevin Miller is a commercial pilot for Delta. He is domiciled in Utah.

12.     Defendant Brian Cink is a commercial pilot for Delta. He is domiciled in Utah.

13.     Defendant Air Line Pilots Association, International ("ALPA") is a labor union that represents pilots for Delta. ALPA has its principal place of business in Virginia.

14.     Defendant Richard ("Rick") Harper is an ALPA union representative. He is domiciled in Idaho.

15.     Defendant Adam Bradley is an ALPA union representative. He is domiciled in Utah.

## JURISDICTION AND VENUE

16.     Dunn brings a claim arising under federal labor law for breach of duty of fair representation. *See Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65 (1991); *Vaca v. Sipes*, 386 U.S. 171 (1967).

17.     Dunn brings claims arising under Utah state law for malicious prosecution, *see Hodges v. Gibson Products Co.*, 811 P.2d 151 (Utah 1991), and for defamation, *see Wayment v. Clear Channel Broadcasting, Inc.*, 116 P.3d 271 (Utah 2005).

18.     No party is domiciled in the same state as Dunn. The amount in controversy flowing from Defendants' unlawful conduct exceeds $75,000 in damages.

19.     This Court therefore has subject-matter jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1332.

20.     Venue is proper under 28 U.S.C. §1391 because "a substantial part of the events or omissions giving rise to the claim[s] occurred" within the District of Utah.

## BACKGROUND AND FACTUAL ALLEGATIONS

### A.     Dunn is a Decorated Military Aviator and Experienced Civilian Pilot.

21.     Dunn had twenty-three years of aviation experience when Banish's false accusation derailed his career. Dunn began his Air Force service in 2003 when he commissioned as an officer. He spent over ten years on active duty, deployed three times to Afghanistan, and flew multiple combat missions. He now serves in the Air Force Reserve and holds the rank of Lieutenant Colonel.

22.     Dunn worked for Delta as a commercial pilot from 2015 to 2022 while serving in the Air Force Reserve. His duty location was in Salt Lake City, Utah.

23.     While flying for Delta, Dunn completed thousands of flight hours without incident and was a pilot in good standing.

24.     Dunn also served as a deputized Federal Flight Deck Officer ("FFDO"), which authorized him to carry a government-issued firearm on the flight deck of civilian aircraft. The FFDO program was created by Congress after September 11, 2001, to ensure that armed pilots could defend the flight deck against terrorist threats.

**B.     The Cockpit Banter Incident**

25.     In August 2022, Dunn and Banish co-piloted a series of cross-country flights over three days. Banish was the captain and had managerial authority over Dunn and the other crew members. Dunn served as the first officer and was second in command.

26.     Banish and Dunn became familiar with one another during the flight series. By the end, their conversation was often informal, and the pair regularly made jokes.

27.     Dunn was not aware at the time but Banish had grown to dislike Dunn personally over the course of the three days, and Banish solicited negative information on Dunn from fellow Delta pilots throughout that time. As Dunn later learned through discovery in his criminal case, Banish complained that Dunn gave too much input into flight operations. Banish was also contemptuous of Dunn for objecting to the Air Force's covid-19 vaccine policies on religious freedom grounds.

28.      On August 22, 2022, Banish and Dunn departed from Atlanta for Salt Lake City to complete the final leg of the three-day flight series.

29.     Toward the end of the flight, a passenger—who happened to be an off-duty flight attendant—experienced a medical issue while the plane was east of Denver. In accordance with Delta policy, Banish and Dunn contacted the dispatcher and on-call physician. As a team, they determined

that no emergency existed, and that the flight should continue to Salt Lake City rather than divert to Denver.

30.     Thirty minutes later, when the plane was abeam of Grand Junction, Colorado—roughly halfway between Denver and Salt Lake City—Banish gestured at a regional airport and commented, "we could go there" if the passenger's medical situation deteriorated.

31.     Based on context and intonation, Dunn interpreted Banish's comment as a joke—as if to say, "We could land in Grand Junction and earn some extra per diem."

32.     Thirty minutes had passed since the physician declared the medical incident a non-emergency. The decision had been made to press on to Salt Lake City, and the pair had had no further discussion of diverting the plane in that time.

33.     Moreover, Banish had not sought or received the necessary authorization from the flight control officer to make a diverted landing. Delta's policy clearly forbids a captain from unilaterally declaring a medical emergency or unilaterally diverting in a non-emergency medical situation without prior authorization, even calling it one of the two "most common errors crewmembers make." Banish and Dunn were aware of that policy.

34.     In short, although Grand Junction is listed as a potential divert option in cases of engine failure or other emergency airplane malfunctions, it would have violated Delta policy and common sense to conduct a last-minute diversion to a small mountain airport, at night, for a non-emergency medical situation when the plane was less than 40 minutes from touching down in Salt Lake City. This context further demonstrated that Banish's comment was a joke.

35.     Dunn responded with jokes of his own: he first offered to arm wrestle Banish for the right to decide where to land and then, after Banish responded with another joke about the captain having 51 of the 100 votes aboard the aircraft, Dunn joked that he could use his service pistol as a veto to stop Banish from diverting to Grand Junction.

36.     There was no argument building up to these comments. And Dunn did not say them belligerently. He never gestured toward his pistol, raised his voice, or took any other action that could possibly be considered as threatening.

37.     Dunn's comments were an attempt at dark humor, the kind of banter not uncommon among both military and civilian pilots. Context and Dunn's intonation made clear he was joking.

38.     Banish interpreted Dunn's comments in the moment as they were intended: as jokes.

39.      At no time was Banish threatened or intimidated by Dunn. Banish did not alter flight operations or do anything differently because of Dunn's comments.

40.     Banish apparently thought Dunn had crossed a line and told Dunn that he shouldn't make such jokes. Dunn said he would refrain from similar jokes in the future. He explained that one reason he enjoys his position as a first officer is that he tends to fly with captains who are older pilots, many of whom are former military. Dunn acknowledged that older pilots are more comfortable with sarcasm and dark humor than younger pilots and that Dunn should be more sensitive to the fact that not everyone is comfortable with such humor. The conversation carried on naturally for a few minutes before it became time to initiate the descent into Salt Lake City.

**C.      Banish and Other Delta Supervisors Took No Steps to Preserve the Cockpit Recording.**

41.     The flight landed around 9:00 pm in Salt Lake City.

42.     Dunn offered to greet the passengers as they deplaned so Banish could get home. Banish agreed and left Dunn with the passengers.

43.     Banish did not preserve the cockpit audio recording.

44.     To preserve the recording, a pilot must take action to override the device's auto-erase function within a certain period of time after landing.

45.     Under Delta policy, a pilot must preserve the cockpit audio recording following any "accident, incident, or irregularity" during the flight. Federal law imposes similar requirements. *See* 14 C.F.R. §121.359(h).

46.     Incidents and irregularities include anything that threatens the safety of a crewmember. A true threat of violence to use a firearm against the captain during a flight would unquestionably satisfy the definition of an "incident" or "irregularity" requiring preservation of the voice recorder.

47.     Banish did not preserve the cockpit audio recording. Nor did he consult with any Delta supervisors or lawyers about whether he should preserve the recording. The only plausible explanation for his decision not to preserve the recording is that he did not believe an "accident, incident, or irregularity" had occurred.

48.     Shortly after deplaning, Banish had a phone conversation with Defendant Kevin Miller. Miller was Delta's supervising pilot for the Salt Lake City area and Banish's and Dunn's superior.

49.     Miller was also Banish's "close" personal friend.

50.     During that conversation, Banish told Miller about Dunn's comments.

51.     Miller had the authority and ability to preserve the cockpit recording.

52.     Miller also did not think that an incident or irregularity had occurred and thus did not take steps to preserve the recording.

53.     Around midnight, Defendant Brian Cink, Delta's supervising pilot for the region, received an email notifying him of Dunn's comments. On information and belief, it was still possible to preserve the cockpit audio recording at that time. Cink did not take steps to preserve the recording.

54.     Had the cockpit audio recording been preserved, it would have shown that Dunn's comments were a joke and that Banish interpreted them that way in the moment, even though he did

not appreciate the joke. Instead, the conversation between Banish and Dunn was overwritten before Dunn had any indication that Banish would make a federal case out of his off-handed comment.

**D.      Banish Spurs Investigations by Delta and the FBI.**

55.      On the morning of August 23, 2022, Banish sent Miller a New York Times article reporting on the Air Force's retaliation against Dunn for his religious opposition to the covid-19 vaccine mandate and Dunn's resulting application for injunctive relief to the United States Supreme Court.

56.      Within an hour after receiving Banish's message about the New York Times article, Miller contacted Dunn to schedule an interview about the cockpit incident.

57.      An interview is a formal step in Delta's pre-disciplinary process under its collective bargaining agreement. *See* Delta Pilot Working Agreement 2016-2019 ("CBA") §18.C.1.b.

58.      The interview was scheduled for later that week, but it was delayed for several days without explanation.

59.      Banish, Miller, and Cink were in frequent contact about the cockpit incident around this time.

60.      For example, on August 24, Cink asked Miller by text message for the link to the New York Times article that Banish sent him.

61.      On August 25, 2022—three days after the cockpit conversation—Banish called the FBI and reported Dunn's comments on a recorded line. During the call, Banish told the intake officer that Dunn "jokingly suggested" he would shoot Banish if he diverted.  When the intake officer asked what crime Banish was reporting, Banish stated that a "federal flight deck officer … essentially joked" about shooting him during a flight. Banish said he was making the report because "something seems off" about Dunn and that "[Dunn] doesn't seem completely normal."

62.     It is unclear what led Banish to conclude that Dunn—a decorated military officer, devoted husband, father of four, foster parent, seven-year Delta pilot, committed member of his local church, and volunteer in the community—was not "normal." But Banish apparently decided to instigate the FBI to target Dunn for what Banish conceded was a joke, simply because he wanted to put Dunn on the FBI's radar.

63.     On information and belief, Miller, Cink, or one or more other Delta employees encouraged Banish to call the FBI.

**E.      Delta's Pre-Disciplinary Interview**

64.     On August 30, 2022, Delta employees interviewed Dunn at the Salt Lake City Chief Pilot's Office.

65.     Cink ran the meeting, and Miller and two ALPA members, Rick Harper and Adam Bradley, attended as Dunn's representatives.

66.     Dunn had requested ALPA First Officer representative Pete Van Stee as his representative, but Miller arranged for Harper to represent Dunn.

67.     At the time, Dunn had no reason to object and did not object. He did not know that Harper and Banish had already discussed the incident before the interview and without Dunn present.

68.     Bradley attended at Harper's request and took notes. Harper told Dunn that Bradley was new to the position and that attending the hearing would be a good training opportunity for Bradley.

69.     On information and belief, everyone in the room except Dunn knew that Banish had contacted the FBI to report Dunn's comments and that the matter was now more than a workplace dispute. No one informed Dunn that he was (or soon would be) under federal investigation.

70.     Despite knowing of the developing criminal investigation of Dunn, Harper encouraged Dunn to speak "openly" about the cockpit incident.

71.     Dunn noticed the absence of a stenographer and asked to record the interview, but Cink refused.

72.     Although the collective bargaining agreement gives Dunn the right to make a transcript of the proceeding, *see* CBA §18.D.7, neither Harper nor Bradley took steps to safeguard Dunn's right.

73.     Cink and Miller questioned Dunn for ninety minutes. The interview was hostile toward Dunn. The questioning was accusatory and designed to elicit incriminating information. Cink and Miller were not interested in getting Dunn's side of the story.

74.     For example, Cink asked Dunn if he knew how fortunate it was that Banish was able to safely land the plane after Dunn's comment—a question designed to prod Dunn into exhibiting remorse. Dunn responded that while he never meant to threaten Banish, he admired Banish's ability to perform his duties if that is how he felt. Dunn gave this response having no reason to believe Banish ever felt threatened, and Banish's statements during and soon after the flight do not indicate that he was ever in fear. The government later used these statements against Dunn as supposed evidence that Dunn knew he had threatened Banish.

75.     Throughout the interview, Dunn maintained that he never threatened or intimidated Banish. In response to Cink and Miller's hostile questioning, Dunn apologized for "taking [his] joke too far."

76.     Immediately after the interview, Dunn met with Harper and Bradley in the Salt Lake City airport. Harper made comments about Dunn losing his military security clearance and indicated that Dunn may need to undergo a medical evaluation and treatment.

77.     At the time, these comments confused Dunn. He thought the interview was only a matter of employment discipline and would have no effect on his security clearance or medical clearance.

78.     The next week, Harper told Dunn that he talked with Banish about calling the FBI. This caused Dunn to distrust Harper and remove him as Dunn's ALPA representative. On information and belief, Harper made the comments about security clearance and medical evaluation because he was aware of potential or existing criminal proceedings against Dunn.

79.     On information and belief, Harper, or one or more other ALPA representatives, counseled or encouraged Banish to call the FBI.

**F.     Dunn Resigns Under Pressure From Delta.**

80.     On October 11, 2022, Cink emailed and called Dunn to inform him of Delta's decision to terminate his employment and to schedule a meeting on October 14 to deliver Delta's formal termination letter.

81.     On the call, Cink informed Dunn that if he resigned before receiving Delta's formal termination letter, his personnel record would indicate "Resigned." If he resigned after receiving the letter, his personnel record would indicate "Resigned in lieu of Termination."

82.     The difference is important to Dunn because federal law requires Delta to disclose the personnel records of their former pilots to future employers. Having a personnel record that states "Resigned in lieu of Termination" is a substantial impediment to future employment.

83.     Dunn chose to resign before formal termination. In exchange for the promised neutral language in his personnel record, Dunn did not exercise his right to challenge Delta's decision by filing a grievance. *See* CBA §18.C.2.

84.     Dunn emailed his resignation letter to Cink on October 14, 2022. Cink received the resignation letter before the scheduled meeting.

85.     After Dunn's employment with Delta ended, Delta reported his personnel record to the Federal Aviation Administration as required by the Pilot Records Improvement Act of 1996 ("PRIA"). The personnel record indicates the end of Dunn's employment with Delta as "Separation

– Invol[untary] w/o Ben[ifits]," and "RESIGN IN LIEU – CONDUCT." On the record, the word "CONDUCT" is scratched out with pen but still clearly readable.

86. The collective bargaining agreement requires that the "personnel record of a pilot whose discipline/discharge dispute has been resolved … will reflect the agreed upon resolution of the matter." CBA §18.D.6.

87. Delta violated Dunn's rights under the collective bargaining agreement because Dunn's personnel record did not reflect the agreed-upon resolution that Cink conveyed during the October 11 phone call.

88. Throughout the resignation process, no ALPA representative took steps to protect Dunn's substantive and procedural rights under the collective bargaining agreement.

### G. Dunn Is Indicted.

89. On or about December 15, 2022—four months after the incident—Banish sat for an interview with several government agents and a federal prosecutor. In the interview, Banish stated he "did not know" whether Dunn's comments were a joke. The prosecutor asked him three times—in three different ways—if Dunn's comments had interfered with his duties "in any way." All three times Banish admitted they had not.

90. On information and belief, at some point between December 15, 2022, and December 29, 2023, Banish changed his story and falsely told the government he did not think Dunn was joking.

91. On October 18, 2023—more than a year after the incident—the United States Attorney for the District of Utah indicted Dunn for felony interference with a flight crew using a dangerous weapon. Dkt. 1, *United States v. Dunn*, 23-cr-375 (D. Utah Oct. 18, 2023).

92. A person is guilty of that offense if he, "by assaulting or intimidating a flight crew member or flight attendant of the aircraft, interferes with the performance of the duties of the member or attendant or lessens the ability of the member or attendant to perform those duties, or attempts or

conspires to do such an act." 49 U.S.C. §46504. When a "dangerous weapon is used," the penalty includes mandatory incarceration up to life imprisonment. *Id.*

93.     Dunn is innocent of that offense. He never assaulted or intimidated any flight crew member or flight attendant, and he did not attempt or conspire to do so. His comments in no way interfered with the duties of Banish or others or lessened their ability to perform those duties. Banish did not subjectively interpret Dunn's comments as assaultive or intimidating, and no reasonable observer would interpret Dunn's comments that way. Banish understood that Dunn was joking in response to Banish's own joke about diverting to an airport despite the earlier decision to continue to Salt Lake City.

94.     On information and belief, the prosecution was not aware that Banish had previously told the FBI that Dunn was joking.

95.     On December 6 and 7, 2023, Banish, Miller, and another Delta pilot exchanged text messages expressing excitement about Dunn's upcoming arraignment. The other Delta pilot texted he had bid the day off, "popcorn ready. lunch/drink/apres/whatever afterward." Miller responded, "sounds like a party I don't want to miss." Banish then responded, "sounds like a good party! I'll bid it off too."

96.     On December 29, 2023, the government filed a detention memorandum elaborating on the allegations underlying the indictment. The memorandum stated that "[Banish] did not consider [Dunn's comments] a joke," and that Banish was "concerned if [he] diverted to Grand Junction, [Dunn] would use his weapon to relieve [Banish] of command." Dkt. 15 at 4, *United States v. Dunn*, 23-cr-375 (D. Utah Dec. 29, 2023).

97.     Dunn could have learned that Banish made this knowingly false statement to prosecutors no earlier than December 29, 2023, when the government disclosed Banish's statement in the detention memorandum.

98.     Dunn was arraigned on January 4, 2024. After the arraignment, Dunn's lawyer made a statement to the media indicating that the cockpit conversation involved a simple misunderstanding and that Dunn maintained his innocence.

99.     On January 5 and 6, 2024, Banish, Miller, and the third Delta pilot again texted each other. Miller said he was "happy to read that the judge was unmoved" by Dunn's not-guilty plea and that the trial should be "quite entertaining." He indicated that he would "bid March 12 off," presumably so that he could attend the trial, which was originally scheduled to begin on that date. The other Delta employee mocked Dunn and mused whether "cupcake Dunn" had "suffered irreversible self-image damage." Banish responded, "lol. Exactly."

100.    After receiving the first discovery from the government containing a transcript of Banish's December 2022 interview, Dunn's defense attorney spoke with the prosecutor and his supervisors to encourage them to dismiss the indictment. Dunn's attorney explained that the government could not possibly prove the interference element of the charged crime because Banish had stated in a recorded interview that Dunn's comments did *not* interfere with the performance of his duties "in any way."

101.    On information and belief, the government asked Banish to sit for a second interview on or about January 29, 2024, to determine whether Banish would testify to certain facts necessary for a conviction. A Delta attorney attended the interview remotely. In the interview, Banish stated that he did not consider Dunn's comments a joke. He also stated, for the first time, that Dunn's comments affected his decision making because he feared he would have to decide between diverting or getting shot. On information and belief, these changes in Banish's story prompted the government to continue the prosecution rather than dismissing the indictment.

102.    Dunn learned of the knowingly false statements Banish made in that interview when Dunn received the interview notes in the government's discovery file in February 2024.

103.    Cink also participated in the prosecution. Cink was prepared to serve as both an expert and fact witness for the government. Among other things, Cink was prepared to testify that a decision to divert the flight to Grand Junction under the circumstances would have been rational and consistent with Delta policy. Cink was also prepared to testify about the August 30, 2022, interview, where Cink used leading and unfair questions to elicit statements from Dunn.

104.    On information and belief, Delta encouraged or approved Cink's participation in Dunn's prosecution.

105.    Cink's testimony about diversion criteria would have been in plain contradiction of the ordinary understanding of Delta's policy, and Cink would not be allowed to make such representations without approval from Delta's legal counsel.

106.    Banish's and Cink's testimony was crucial to the government's case against Dunn. Given the government's confidence that Banish and Cink would offer inculpatory testimony, the prosecutor not only refused to dismiss the indictment but even refused to offer a plea deal giving Dunn the opportunity to plead to a lesser offense. This was especially surprising given that the prosecutor himself told both Banish and the investigating agent before the indictment that he did not think he could prove the elements of the felony because Dunn's comments did not interfere with the duties of a flight crew member.

**H.    Prosecutors Learn of the FBI Tape and Move to Dismiss the Indictment.**

107.    Shortly before trial, Dunn obtained the audio recording of Banish's FBI call. On the recording, Banish repeatedly acknowledges that Dunn was joking and asserts that the reason he called is that he doesn't think Dunn is "normal."

108.     Dunn provided the recording to the prosecutors on August 12, 2024.

109.    Four days later, the government moved "for leave to dismiss the indictment without prejudice." Dkt. 155, *United States v. Dunn*, 23-cr-375 (D. Utah Aug. 16, 2024). In the motion, the

government stated that it "came into possession of previously unknown evidence" and that it "no longer believes it can prove all elements of the charged offense beyond a reasonable doubt."

110.    On August 19, 2024, the United States District Court for the District of Utah granted the government's motion and dismissed the indictment without prejudice. Dkt. 161, *United States v. Dunn*, 23-cr-375 (D. Utah Aug. 19, 2024).

## I.    Dunn's Life After Banish's False Accusation

111.    When Dunn was indicted, he was serving overseas at Ramstein Airbase in Germany, manning a 24-hour watch center for combat flight operations in the region. To fulfill those and other duties, Dunn holds a high-level security clearance.

112.    As a result of the indictment, following standard procedure, the Air Force suspended Dunn's security clearance and sent him back to the United States. Dunn's access to base was restricted, and he could not find meaningful work within the Air Force while the indictment remained pending.

113.    In November 2023, immediately following the indictment, the Federal Aviation Administration suspended Dunn's pilot's license based on the Transportation Security Administration's determination that Dunn was a security threat. Dunn followed TSA's procedures and requested the materials used in the threat determination, but TSA and FAA have not responded.

114.    On May 26, 2023, Dunn received notice from FAA that his airman's medical license was suspended. As FAA explained in an earlier letter, the suspension was based on "credible information regarding an in-flight incident in which you may have made verbal threats to your aircraft's captain while in possession of a firearm."

115.    After the indictment was dismissed, the Air Force restored Dunn's security clearance.

116.    Dunn's personnel record still reports his separation with Delta negatively.

117.    Dunn's PRIA report continues to list unfavorable annotations.

118.    Dunn's pilot's license and airman's medical license remain suspended.

119.    Dunn expended hundreds of thousands of dollars in legal fees to defend against the criminal charge.

120.    Despite Dunn's efforts, he has been unable to obtain new employment as a civilian pilot. The news coverage of the indictment will remain available to all future employers and interfere with his prospects for employment.

121.    As a result, Dunn has suffered, and continues to suffer, damages from his inability to find a replacement job.

122.    Banish's false accusation garnered widespread public attention, including reports in national news outlets. As a result of that accusation and resulting criminal trial, Dunn suffered severe damage to his reputation.

123.    Dunn also suffered damages from harm to his family. His wife and four young children were abruptly displaced when the Air Force sent Dunn and his family back from Germany to the United States for Dunn to face criminal prosecution. They have been subjected to severe and negative media attention, which has affected their ability to connect with community and make friends. They lived for ten months with the uncertainty of whether their husband and father would spend the rest of his life in prison.

## CLAIMS FOR RELIEF
### COUNT I
### Malicious Prosecution
### (Delta, Banish, Cink, Miller, ALPA, Rick Harper, Adam Bradley)

124.    Mr. Dunn repeats and realleges each of the prior allegations as though set forth fully herein.

125.    Under Utah law, the tort of malicious prosecution has four elements: "(1) defendants initiated or procured the initiation of criminal proceedings against an innocent plaintiff; (2) defendants did not have probable cause to initiate the prosecution; (3) defendants initiated the proceedings

primarily for a purpose other than that of bringing an offender to justice; and (4) the proceedings terminated in favor of the accused." *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 156 (Utah 1991). All four elements are met here.

126.    *First,* Defendants initiated or procured the initiation of criminal proceedings against Dunn. They were "actively instrumental in putting the law in force." *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct. App. 1987). Defendants also "continued" the criminal proceedings. *Id.* at 843.

    a.   Banish was the only person who witnessed Dunn's statements. No prosecution could have occurred without Banish's false accusation.

    b.   Banish reported Dunn's comments to the FBI. Although Banish stated that Dunn was joking, that report nevertheless set in motion Dunn's wrongful prosecution. Banish knew when making the report that Dunn's comments did not amount to a crime; otherwise, he would have preserved the flight recording, as Delta policy requires. Banish instead made the report out of personal animosity toward Dunn.

    c.   Banish enabled and encouraged Dunn's prosecution. Banish made a series of knowingly false statements to investigators and prosecutors, both before and after the indictment, in a deliberate attempt to further the prosecution against Dunn.

    d.   Banish gave these increasingly false statements because he wanted Dunn's prosecution to proceed. The government was concerned about the strength of its evidence, and it dismissed the case when Dunn provided exculpatory evidence showing that Banish was not threatened and that Banish gave contradictory statements to the FBI.

    e.   Banish had the ability to stop the prosecution at any time. All he had to do was tell the truth.

    f.   Cink and Miller helped initiate and continue the criminal proceedings against Dunn. Knowing of the FBI call, their questions during the August 30, 2022, interview were a

deliberate effort to elicit incriminating statements from Dunn in anticipation of a future criminal charge. On information and belief, Miller or Cink encouraged Banish to call the FBI.

g.   Cink assisted the government's prosecution as both a fact and an expert witness. With Delta's direction or approval, Cink was prepared to give false testimony as to Delta's policy regarding flight diversion.

h.   Harper and Bradley helped initiate the criminal proceeding against Dunn. Harper encouraged Dunn to be "open" during the interview even though, on information and belief, he and Bradley knew of the FBI call.

127.   Dunn is innocent of the crime charged in the indictment. *See* supra ¶ 93.

128.   *Second,* Defendants did not have probable cause to initiate or continue Dunn's prosecution. To have probable cause, the "accuser must have a reasonable basis for believing the accusation and must also subjectively believe the accusation to be true." *Hodges*, 811 P.2d at 158.

a.   Banish knew his accusation was not true, because he did not believe that Dunn was attempting to intimidate him, and he was not intimidated. Rather, when speaking to the FBI, Banish described Dunn's comments as something Dunn "jokingly suggested."

b.   Banish also knew that Dunn's comments had not interfered with the performance of his duties or lessened his ability to perform those duties. He admitted as much in his first interview with the prosecutor and federal agents in December 2022.

c.   The other Defendants also knew Banish's accusation was not true. On information and belief, Banish told Miller, Cink, Harper, and Bradley around the time of the August 30, 2022, interview that Dunn was joking.

129.  *Third,* Defendants acted with an improper purpose. "The only proper purpose for initiating criminal proceedings is to bring an offender to justice." *Hodges*, 811 P.2d at 161. "If the person initiating criminal proceedings does not himself believe in the guilt of the accused, it is plain that he cannot have a proper purpose." Restatement (Second) of Torts §668.

    a.  Banish did not believe Dunn was guilty. He initiated and continued the criminal proceedings out of personal animosity toward Dunn. He told the FBI—twice—that the reason he filed the report was because he thought Dunn was not "normal" and wanted him on the FBI's radar. On information and belief, Banish's view that Dunn was not normal was based on Dunn's religiosity, opposition to the covid-19 vaccine, and political views.

    b.  Text messages show that Banish and Miller were gleeful at the prospect of Dunn being convicted of a felony that could put him in prison for life, despite knowing that Dunn was joking and that Banish was not threatened.

    c.  The other Defendants also did not believe Dunn was guilty. They acted out of animosity toward Dunn, loyalty to Banish, and a perceived duty to Delta.

130.  *Fourth*, the criminal case terminated in Dunn's favor. Utah courts follow the Restatement (Second) of Torts to make this determination. *Neff v. Neff*, 247 P.3d 380, 394 (Utah 2011). Favorable termination occurs by "the formal abandonment of the proceedings by the public prosecutor," or "the quashing of an indictment." Restatement (Second) of Torts, §659; *see also Hodges*, 811 P.2d at 161 (finding favorable termination where "the action … was dismissed on the motion of the prosecuting attorney"). Dismissal with prejudice is not required. Restatement (Second) of Torts, §659, cmt b.

131.  Here, the prosecution moved to dismiss the indictment because it "no longer believe[d] it can prove all elements of the charged offense beyond a reasonable doubt" after it received

the full evidence of Banish's FBI report. The district court granted the government's motion and dismissed the indictment without prejudice on August 19, 2024.

132.    Delta and ALPA are vicariously liable for their employees' malicious prosecution tort. An employer is liable for its employees' tortious conduct, including malicious prosecution, if the conduct was committed "within the scope of employment" and was motivated at least in part "to further the interests of the employer." *Hodges*, 811 P.2d at 156.

a.    Banish, Miller, and Cink acted within the scope of employment because they each had managerial authority over Dunn, and the malicious prosecution arose from Dunn's on-the-job conduct. *See Hodges*, 811 P.2d at 157.

b.    Alternatively, and in conjunction, Banish acted within the scope of employment because he acted with the approval and under the direction of Delta officials, including Miller and Cink, who were Banish's superiors at Delta. Miller and Cink acted within the scope of employment because, on information and belief, their Delta superiors approved and directed their participation in the criminal proceedings.

c.    Banish, Miller, and Cink acted in part to further Delta's interests, including its interest in selecting pilots. Shortly after the incident, Banish contacted Miller, the Delta employee responsible for overseeing pilots in the Salt Lake City area, who initiated the pre-disciplinary interview process with Cink that resulted in Dunn's termination.

d.    Harper and Bradley acted within the scope of employment because they served as Dunn's union representatives during the interview and subsequent proceedings. Harper and Bradley were motived in part to further ALPA's interests in minimizing conflict with management.

133.    Accordingly, Defendants committed the tort of malicious prosecution against Dunn.

134.    Dunn suffered, and continues to suffer, damages from Defendant's tortious conduct.

135.    Dunn incurred hundreds of thousands of dollars in legal fees to defend against the criminal case.

136.    Dunn suffered severe damage to his reputation.

137.    Dunn lost wages and has been unable to secure employment of replacement value.

138.    Dunn is entitled to punitive damages because Defendants "acted knowingly and maliciously." *Hodges*, 811 P.2d at 163.

## COUNT II
### Defamation
### (Delta, Banish)

139.    Mr. Dunn repeats and realleges each of the prior allegations as though set forth fully herein.

140.    Under Utah law, the tort of defamation has four elements: "(1) that the defendants published the statements; (2) that the statements were false, defamatory, and not subject to any privilege; (3) that the statements were published with the requisite degree of fault; and (4) that their publication resulted in damage to the plaintiff." *Hogan v. Winder*, 762 F.3d 1096, 1105 (10th Cir. 2014) (internal quotations omitted). All four elements are met here.

141.    *First*, Banish published several false statements:

a.    On or around December 15, 2022, Banish told investigators in an interview that he "was not sure" whether Dunn was joking.

b.    At some point between that date and December 29, 2023, Banish told prosecutors in an interview that he "did not consider [Dunn's comments] a joke." Dunn could have discovered this statement at the earliest on December 29, 2023, when the government recounted the statement in a court filing.

c.    On or around January 29, 2024, Banish again told prosecutors in an interview that he "did not think" Dunn was joking. Banish also told prosecutors that Dunn's comments

had interfered with his decision making, which was the opposite of what he had said in his first interview in December 2022.

142.    *Second*, Banish's statements were false, defamatory, and not subject to privilege.

  a.    The statements were false because Banish knew Dunn was joking. Banish acknowledged that fact on a recorded FBI line a few days after the cockpit incident. Banish also knew that Dunn's comments had not interfered with the performance of his duties or lessened his ability to perform his duties in any way, yet he falsely told the prosecutors on January 29, 2024, that Dunn's comments interfered with his decision making.

  b.    The false statements were defamatory because they impugned Dunn's character and accused him of a felony.

  c.    These statements were not subject to any privilege because Banish made them with actual malice and knowing they were false. *See Shanley v. Hutchings*, 716 F. Supp. 3d 1179, 1195 (D. Utah 2024).

143.    *Third*, Banish published the statements with the requisite degree of fault. Dunn is not a public figure, and liability in these circumstances does not require a heightened degree of fault. Even so, Banish acted with the highest degree of fault because he made these statements knowing they were false and with specific intent to impose severe negative consequences on Dunn.

144.    *Fourth*, Banish's false and defamatory statements caused Dunn damages. Among other things, Banish's false statements caused Dunn severe reputational harm, caused and advanced an unjustified prosecution that cost Dunn substantial legal fees, and interfered with his ability to find gainful employment.

145.    Delta is vicariously liable for Banish's defamation. As explained above, Banish acted within the scope of employment and was motivated in part to further Delta's interests. *See* supra ¶ 132.

146.     Accordingly, Banish and Delta committed the tort of defamation against Dunn.

## COUNT III
### Breach of Duty of Fair Representation
### (ALPA, Harper, and Bradley)

147.     Mr. Dunn repeats and realleges each of the prior allegations as though set forth fully herein.

148.     Under federal law, a labor union owes a duty of fair representation to the employees in its bargaining unit. *See Vaca v. Snipes*, 386 U.S. 171, 177 (1967). "[T]he duty of fair representation [stands] as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Id.* at 182. Courts have power to "fashion remedies for [breaches of that] duty." *Id.* at 188.

149.     A union breaches its duty of fair representation when its conduct toward an employee is "arbitrary, discriminatory, or in bad faith." *Id.* at 190. A union must represent employees "adequately as well as honestly and in good faith." *Air Line Pilot's Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 75 (1991).

150.     The duty of fair representation is "thus akin to the duty owed by other fiduciaries," like "the duty a trustee owes to trust beneficiaries," or "the relationship … between attorney and client." *Id.* at 74.

151.     The duty of fair representation extends both to the bargaining process and to the union's "enforcement of the resulting collective bargaining agreement." *Vaca*, 386 U.S. at 177.

152.     ALPA, Harper, and Bradley breached the duty of fair representation they owed to Dunn.

153.     Dunn had the right to union representation during the August 30, 2022, interview. CBA §18.C.1.b. He also had the right to union representation to file and pursue a grievance challenging Delta's decision to terminate Dunn's employment. *Id.* §18.C.2.e.

154.     ALPA, Harper, and Bradley breached the duty of fair representation in several ways:

155. *First*, Harper represented Dunn under a conflict of interest.

    a. Harper was selected as Dunn's representative by Miller, who was Banish's friend and direct supervisor, as well as a Delta employee.

    b. On information and belief, Harper encouraged Banish to call the FBI and report Dunn's comments.

    c. Harper knew before the August 30 interview that Banish reported Dunn's comments to the FBI. On information and belief, Harper and Banish discussed the call before the meeting.

    d. ALPA allowed Harper to serve as Dunn's representative despite that conflict of interest and despite Dunn requesting another ALPA member by name.

156. *Second*, Harper knew Dunn was, or was likely to be, under criminal investigation, yet he encouraged Dunn to speak "openly" at the August 30 interview. As a result, Dunn made statements that the government leveraged to justify its prosecution of Dunn.

157. *Third*, Harper failed to advocate for Dunn when Cink and Miller conducted a hostile interview designed to elicit incriminating statements.

158. *Fourth*, Harper failed to advocate for Dunn when Cink refused to allow the interview to be recorded. That failure frustrated Dunn's right to "make a certified transcript of any proceedings" related to a disciplinary matter. CBA §18.D.7.

159. *Fifth*, Bradley failed to timely provide his notes of the August 30 interview when Dunn requested them. Dunn first requested the notes on or around September 8, 2022, and Bradley did not deliver them until on or around April 29, 2024. Bradley's notes revealed discrepancies in Cink's account.

160. *Sixth*, ALPA failed to fairly represent Dunn after the August 30 interview.

a. ALPA failed to represent Dunn after the interview, and that abandonment caused Delta to breach Dunn's employment contract.

b. Dunn agreed to forgo a grievance and resign because Delta represented that Dunn's personnel record would indicate the separation with neutral language. But Delta broke its agreement and indicated the separation with negative language.

c. In doing so, Delta violated Dunn's contractual right that the "personnel record of a pilot whose discipline/discharge dispute has been resolved … will reflect the agreed upon resolution of the matter." CBA §18.D.6.

161.    Accordingly, ALPA, Harper, and Bradley breached the duty of fair representation they owed to Dunn. These acts and omissions by ALPA, Harper, and Bradley fall "far outside a wide range of reasonableness" that marks the boundary of permissible union conduct. *Air Line Pilots Ass'n*, 499 U.S. at 67 (internal quotation omitted).

162.    Dunn suffered, and continues to suffer, damages from these breaches, including severe reputational harm, costs of defending himself against an unjustified criminal prosecution, and the inability to find gainful employment.

163.    In addition, because ALPA's, Harper's, and Bradley's breaches of their duty of fair representation caused Delta to breach the collective bargaining agreement, they are jointly and severally liable for damages resulting from that breach. *See Vaca*, 386 U.S. at 197 n.18.

164.    The statute of limitations for a fair representation claim is six months, starting when the employee learned or should have discovered the circumstances constituting a breach. *See DelCostello v. International Broth. of Teamsters*, 462 U.S. 151, 169-70 (1983).

165.    Dunn didn't learn of the full scope of Harper's conflict of interest until February 2024 when he received the prosecutor's discovery file. Notes in the discovery file suggest Harper talked to Banish and knew of the FBI call before the August 30 interview.

166.    The limitations period for a fair representation claim is subject to equitable tolling. *See Edwards v. Int'l Union, United Plant Guard Workers of Am.*, 46 F.3d 1047, 1054 (10th Cir. 1995).

167.    Under those principles, the statute of limitations for Dunn's claim was tolled until August 19, 2024, when his indictment was dismissed. Dunn could not make in-court statements in a civil case while he was the defendant in a criminal case involving the same facts and circumstances, and the Defendants' actions contributed directly to the initiation of those criminal proceedings. Accordingly, Dunn's fair representation claim is timely.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants and provide the following relief:

A.     a declaratory judgment that:

    i.   Defendants committed the tort of malicious prosecution against Dunn.

    ii.   Delta and Banish committed the tort of defamation against Dunn.

    iii.   ALPA, Harper, and Bradley breached the duty of fair representation they owned to Dunn.

B.     a permanent injunction requiring Defendant Delta to correct Dunn's personnel record;

C.     compensatory damages;

D.     punitive damages;

E.     reasonable costs and expenses of this action, including attorneys' fees; and

F.     all other relief that Plaintiff is entitled to, as the Court deems just and proper.

Dated: December 30, 2024

Respectfully submitted,

 _/s/ Tyler Green_____

Patrick Strawbridge*                    Tyler Green (Utah Bar No. 10660)
Matt Pociask*                           CONSOVOY MCCARTHY PLLC
CONSOVOY MCCARTHY PLLC                   222 S. Main Street, 5th Floor
1600 Wilson Blvd., Ste. 700             Salt Lake City, UT 84101
Arlington, VA 22209                     (703) 243-9423
(703) 243-9423                          tyler@consovoymccarthy.com
patrick@consovoymccarthy.com
matt@consovoymccarthy.com

*Pro hac vice applications forthcoming