Rick Thaler (7002)
David B. Dibble (10222)
Katherine E. Priest (14758)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
Telephone: (801) 532-1500
Facsimile: (801) 532-7543
Email: rthaler@rqn.com
         ddibble@rqn.com
         kpriest@rqn.com

*Attorneys for Defendants Delta Air Lines, Inc., Robert Banish,*
*Kevin Miller, and Brian Cink*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JONATHAN DUNN, | **DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) AND UTAH'S UNIFORM PUBLIC EXPRESSION PROTECTION ACT** |
| Plaintiff, | |
| v. | |
| DELTA AIR LINES, INC.; ROBERT BANISH; KEVIN MILLER; BRIAN CINK; AIR LINE PILOTS ASSOCIATION, INTERNATIONAL; RICHARD HARPER; and ADAM BRADLEY, | Case No.: 2:24-cv-00967-HCN |
| Plaintiff, | |
| Defendants. | Judge Howard C. Nielson, Jr. |
| | Magistrate Judge Dustin B. Pead |

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Utah Code Section 78B-25-103, Defendants Delta Air Lines, Inc. ("Delta"), Robert Banish ("Captain Banish"), Kevin Miller ("Miller"), and Brian Cink ("Cink") (collectively the "Delta Defendants"), by and through undersigned counsel of record, submit this motion to dismiss and request that the Court dismiss Plaintiff Jonathan Dunn's ("Dunn") claims against the Delta Defendants for failure to state any claim upon which relief may be granted, and award the Delta Defendants their costs and attorney fees under Utah's Uniform Public Expression Protection Act ("UPEPA").

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS FOR MOTION ............................ 1

BACKGROUND ......................................................................................................... 5

ARGUMENT ........................................................................................................... 12

I.     DUNN'S CLAIMS ARE BASED ON THE DELTA DEFENDANTS' PROTECTED PUBLIC EXPRESSION AND ARE THUS BARRED BY UTAH'S UNIFORM PUBLIC EXPRESSION PROTECTION ACT. ............... 12

     A.    Utah Law Protects Against Retaliatory Lawsuits Meant to Stifle Free Speech. ............................................................................. 12

     B.    Dunn's Claims Sit Squarely Within the First Step of UPEPA. ............... 14

     C.    Dunn Fails to State a Claim Upon Which Relief May Be Granted, as Required by the Second Step of UPEPA. ............................................. 15

II.    PLAINTIFF FAILS TO STATE ANY CLAIM AGAINST THE DELTA DEFENDANTS UPON WHICH RELIEF MAY BE GRANTED ...................... 15

     A.    All of Plaintiff's Claims Against the Delta Defendants Are Barred By the Aviation and Transportation Security Act. .................................. 16

          i.    The Purpose of the Immunity Provision in ATSA is to Increase Safety in Air Travel. ....................................................... 17

          ii.   The Delta Defendants are Immune from Civil Liability for All Reports of Dunn's Threats to Law Enforcement. ................... 17

     B.    Dunn Fails to State a Viable Claim of Defamation. ................................ 23

          i.    Each Alleged Defamatory Statement is Protected by the Judicial Proceedings Privilege. ...................................................... 24

          ii.   Captain Banish's Allegedly Defamatory Statements are Incapable of Sustaining a Defamatory Meaning. ......................... 26

          iii.  The Alleged Defamatory Statements are Inactionable Opinion. ...................................................................................... 28

     C.    Dunn's Malicious Prosecution Claim Fails as a Matter of Law and Must Be Dismissed. ................................................................................. 30

i.      The Delta Defendants Did not Initiate or Procure Criminal
        Proceedings Against an "Innocent Plaintiff." .............................. 31

ii.     The Delta Defendants Had Probable Cause to Report
        Dunn's Possible Crime. ................................................................. 34

iii.    The Delta Defendants Reported Dunn's Possible Crime in
        the Interests of Justice. ................................................................ 34

iv.     The Criminal Proceedings Did Not Terminate in Dunn's
        Favor. ............................................................................................ 35

CONCLUSION ..................................................................................................... 36

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Air Wisc. Airlines v. Hoeper*, 571 U.S. 237 (2014) ..................................................... 17, 18

*Albustani v. Alger*, No. C22-5238JLR, 2022 WL 3213331 (W.D. Wash. Aug. 9, 2022) ............................................................................................................ 13, 34

*Alvarado v. KOB-TV, LLC*, 493 F.3d 1210 (10th Cir. 2007) .............................................. 2

*Amica Mut. Ins. Co. v. Schettler*, 768 P.2d 950 (Utah Ct. App. 1989) ...................... 31, 35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................. 15

*Baez v. JetBlue Airways Corp.*, 793 F.3d 269 (2d Cir. 2015) ................... 16, 18, 19, 20, 21

*Bandary v. Delta Air Lines, Inc.*, No. 2:17-CV-1065-DSF, 2019 WL 9244788 (C.D. Cal. Oct. 11, 2019 ............................................................................... 17, 21, 22

*Benoit v. Frederickson*, 908 N.E.2d 714 (Mass. 2009) ..................................................... 14

*Blatty v. New York Times Co.*, 728 P.2d 1177 (Cal. 1986) ............................................... 32

*Bliss v. UHS of Provo Canyon, Inc.*, 2024 WL 4279243 (D. Utah Sep. 24, 2024)........... 12

*Bramhall v. Cyprus Credit Union*, No. 2:29-cv-00477-RJS-DAO, 2021 WL 5180945 (D. Utah Jan. 25, 2021) .............................................................................. 24, 25

*Caixa Geral de Depositos, S.A. v. Rodrigues*, 2005 WL 1541055 (D.N.J. 2005) ............ 23

*Caranchini v. Peck*, 355 F.Supp.3d 1052 (D. Kan. 2018) ........................................... 13, 14

*Clinton v. Security Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023) ....................... 16

*Cox v. Hatch*, 761 P.3d P.2d 556 (Utah 1988) ................................................................. 24

*CSMN Investments, LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276 (10th Cir. 2020) ................................................................................................................. 23

*Davidson v. Baird*, 2019 UT App 8, 438 P.3d 928 (citing *West*, 872 P.2d at 1015)........ 28

*DeBry v. Godbe*, 992 P.2d 979 (Utah 1999)..................................................................... 24

*Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045 (9th Cir. 1982) ........ 23

*Gilbert v. Ince*, 1999 UT 65, 981 P.2d 841 ....................................................... 31

*GoSecure Inc. v. Bhandari*, 637 F. Supp. 3d 368 (E.D. Va. 2022) .................................. 23

*Hindu Temple & Cmty. Ctr. of High Desert, Inc. v. Raghunathan*, 714 S.E.2d 628 (Ga. App. 2011) ............................................................................. 14

*Hodges v. Gibson Prods. Co.*, 811 P.2d 151 .................................................... 31, 34

*Holmes v. Crown Asset Magmt.*, LLC, No. 2:19-cv-00758, 2021 WL 3473050 D. Utah Aug. 6, 2021) ............................................................... 23

*Ilczyszyn v. Southwest Airlines Co.*, 80 Cal.App.5th 577 (Cal. Ct. App. 2022)............... 22

*Jacob v. Bezzant*, 2009 UT 37, 212 P.3d 535................................................... 28

*Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, 285 P.3d 1157, 1164 ............................................................................... 32

*Mouktabis v. Clackamas County*, 536 P.3d 1037 (Or. App. Ct. 2023) ........................... 14

*Neff v. Neff*, 2011 UT 6, 247 P.3d 380 ....................................................... 31, 35

*Peterson v. Adams*, No. 216CV00775RJSPMW, 2018 WL 4627089 (D. Utah Sept. 7, 2018), report and recommendation adopted, No. 216CV00775RJSPMW, 2018 WL 4621760 (D. Utah Sept. 26, 2018)................................................... 31

*Pipkin v. Acumen*, 2020 UT App 111, 472 P.3d 315 .......................................... 26

*Potter v. Utah Driv-Ur-Self System, Inc.*, 355 P.2d 714 (Utah 1960)............................. 34

*Puttuck v. Gendron*, 2008 UT App 362, 199 P.3d 971 ........................................ 36

*Pylypenko v. Bennett*, No. CV-09-690, 2011 WL1338088 (Me. Super. Ct. 2011)........... 14

*Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008) ....................................... 15

*Spencer v. Glover*, 2017 UT App 69, 397 P.3d 780.......................................... 29

*Thomas v. Smith*, No. 2:21-cv-210 DBP, 2023 WL 6194231 (D. Utah Aug. 16, 2023). ............................................................................... 34

*TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175 (10th Cir. 2007) ................................ 32

*Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85 (D.C. Cir. 2015)..................... 23

*West v. Thomson Newspapers*, 872 P.2d 999 (Utah 1994)........................23, 26, 28, 29, 30

**Statutes**

§ 78B-25-102(2) .........................................................................................................12

49 U.S.C. § 44941 ........................................................................................................ 3

49 U.S.C. § 44941(a) .......................................................................................16, 17, 35

49 U.S.C. § 46301 .....................................................................................................35

Utah Code § 78-25-101 ...............................................................................................12

Utah Code § 78B-25-107...........................................................................................13

Utah Code § 78B-25-111...........................................................................................13

Utah Code § 78B-25-112...........................................................................................13

Utah Code Section 78B-25-103....................................................................................i

**Other Authorities**

Restatement (Second) of Torts § 660 (1977) ...................................................36

Restatement (Second) of Torts, § 653 (1977) ............................................31, 33

Uniform Law Commission, Uniform Law and Commentary, § 1 ...................................12

Uniform Public Expression Act. Utah Code Ann. § 78B-25-101 .......................................3

**Rules**

Federal Rules of Civil Procedure  12(b)(6) ...............................................i, 3, 13, 15, 16, 36

## PRECISE RELIEF SOUGHT AND SPECIFIC GROUNDS
## FOR MOTION

Everyone knows you cannot joke about a bomb (or a gun) on an airplane; apparently everyone except Dunn. Dunn, a pilot armed with a loaded handgun, threatened to repeatedly shoot Captain Banish when he proposed preparing for a diversion if a passenger's mid-flight miscarriage became a medical emergency. Now, in obvious retaliation for Captain Banish reporting Dunn's statements to law enforcement (statements that Dunn admits making), Dunn has brought frivolous claims for defamation and malicious prosecution against Captain Banish, Delta, and two other Delta pilots.

To prevent a possible emergency diversion that would delay his arrival in Salt Lake City, Dunn, who was acting as a First Officer on a commercial flight carrying about 200 passengers, has never disputed that he told Captain Banish **that he would shoot him no less than 46 times, or until his body stopped twitching**. Dunn also does not dispute that at the time he made these statements, he was carrying a loaded 9 mm Glock firearm (with 46 rounds of ammunition), which was visible to Captain Banish, and that he and Captain Banish were alone in the flight deck.

Dunn carefully crafts the allegations of the Complaint by omitting his actual statements (that were the subject of the underlying criminal proceeding). But the fact remains that the Delta Defendants are not responsible for the consequences of Dunn's statements, including his criminal prosecution and the loss of his employment as a commercial pilot. Rather, such consequences are all the natural repercussions of Dunn's own, admitted wrongdoing.

Dunn's entire case rests on the false notion that Captain Banish "knew" Dunn was joking but, because of a purported political vendetta against him, misrepresented to law enforcement

that he "did not know" whether Dunn's threats were a joke.[1] Dunn relies on cherry-picked and incomplete statements to spin his false narrative, which is evident from the complete documents referred to and incorporated into Dunn's Complaint. Those documents make clear that Captain Banish (who had never experienced anything like this in his entire career) was not sure what to do. But he believed that law enforcement should be aware of Dunn's statement, so that they could take whatever action *they* deemed necessary. Captain Banish was candid that he did not know (and could not know) Dunn's intent but reported the facts as he knew them, so that if Dunn "does something crazy" Captain Banish could "at least say [he] reported this to the appropriate authorities." (Transcript of the December 15, 2022 Interview ("Dec. 15 Transcript") at 2240-2244, attached hereto as Exhibit A.)[2] Captain Banish described that he was "in a situation where

---

[1] Dunn's Complaint speculates (falsely) that Captain Banish "thought Dunn was not [normal] and wanted him on the FBI's radar [because of] . . . Dunn's religiosity, opposition to the covid-19 vaccine, and political views." (Compl. ¶ 129(a).) Like Dunn, Captain Banish is a conservative, who voted for President Trump both times, did not agree with mandatory COVID vaccines, is very supportive of the Second Amendment, and owns and uses guns. The truth is that Captain Banish thought Dunn was "not normal" because he threatened to shoot Captain Banish until he stopped "twitching" while Captain Banish was flying a commercial aircraft full of passengers. This is only one example of where Dunn's Complaint pleads demonstratively false allegations without any factual support in a desperate attempt to tie together his false narrative.

[2] Dunn's Complaint cherry-picks certain phrases in isolation from three documents produced in discovery in the underlying criminal case and subject to a protective order in that matter restricting their use. But because those "documents referred to in the complaint . . . are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," the Court may consider them on a motion to dismiss. *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). Specifically, the Delta Defendants attached hereto as Exhibit A, a true and correct copy of the Transcript of the December 15, 2022, referenced in paragraph 89 of the Complaint; Exhibit B, true and correct copies of the recording and recording transcript of the August 25, 2022 FBI Call ("FBI Transcript"), referenced in paragraph 61 of the Complaint; Exhibit C, a true and correct copy of the Government's Detention Memorandum ("Det. Memo"), referenced in paragraph 96 of the Complaint; Exhibit D, a true and correct copy of the January 29 Interview Summary ("Jan. 29 Summary"), referenced in paragraph 101 of the Complaint; and Exhibit E, a true and correct copy of the Notice of Intent to Terminate ("Term. Notice"), referenced in paragraph 80 of the Complaint.

if nothing were to happen with this guy, I wouldn't be surprised, but if there were a serious incident, I would also not be surprised." (Ex. B at 5:23-6:1.)

Dunn's claims must be dismissed with prejudice as they are based wholly on communications made by Captain Banish (and the Delta Defendants) that are protected by Utah's anti-SLAPP act – the Uniform Public Expression Act. Utah Code Ann. § 78B-25-101, *et. seq*. Dunn's retaliatory Complaint amounts to a "strategic lawsuit against public participation," satisfying the first element of UPEPA because the Complaint singles out only statements made to federal law enforcement in connection with a federal criminal prosecution – a quintessential act of public participation. The second element of UPEPA is also satisfied because the alleged statements at the heart of Dunn's Complaint are all immune, privileged, or non-actionable as a matter of law. This Court should see this Complaint for what it is – a publicity stunt geared toward rehabilitating the reputation of a careless First Officer who does not believe the rules apply to him and, at least according to him, joked about shooting the Captain of a commercial flight while armed with a firearm and 46 rounds of ammunition. Thus, Dunn's claims must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Delta should be awarded its costs and fees under UPEPA.

The statements that form the gravamen of Dunn's claims cannot be actionable for a number of reasons. First, they are wholly barred by the Aviation and Transportation Security Act ("ATSA") passed by Congress within weeks of 9/11 to increase safety in air travel. 49 U.S.C. § 44941. ATSA specifically grants absolute immunity to airlines and their employees for reporting potential threats to aircraft and passenger safety. ATSA is meant to encourage airlines (and their employees) to report any perceived threat without fear of retaliation. Consistent with the very

purpose of ATSA, Captain Banish reported Dunn's statements to the FBI, so that they could investigate and take appropriate action, if warranted. Allowing Dunn to retaliate against the Delta Defendants by suing them *personally* for reporting alarming behavior would eviscerate the purpose of ATSA immunity.

Second, even if Dunn's claims were not barred by ATSA (they are), Dunn's Complaint is also wholly barred by Petition Clause Immunity (or the Noerr-Pennington doctrine), as Dunn's claims are based on the Delta Defendants' protected right to petition the government for a redress of grievances.

Third, if Dunn's claims somehow survive dismissal pursuant to ATSA or Petition Clause Immunity, Dunn still fails to state substantively valid claims. Dunn's claim for defamation fails as a matter of law because it is barred by the judicial proceedings privilege. Furthermore, the statements upon which the claim is based were neither defamatory nor false (they were unverifiable opinions). Dunn's claim for malicious prosecution fails because the Complaint (and incorporated documents) demonstrate that federal prosecutors acted within their own discretion when filing charges against Dunn. Just like a contract must be read and interpreted as a whole, the Court here must look at the underlying statements in their entirety to see if Dunn's allegations are even a feasible interpretation of what was said. That is particularly so where the only evidence of the statements supporting Dunn's claims are three documents obtained in discovery (and a pleading filed by the Government) in the underlying criminal case from which Dunn quotes **very** selectively.

In sum, Dunn's claims are nothing more than an attempt to vilify those who cooperated with law enforcement in connection with criminal proceedings related to Dunn's statements to

Captain Banish that he would shoot the Captain until he stopped twitching. They have no business in this Court and should be dismissed as a matter of law.

## BACKGROUND

Dunn's "Right Seat Captain" Syndrome During His Trip with Captain Banish Undermined Flight Deck Discipline and Crew Resource Management

Dunn worked for Delta as a First Officer from 2015 to 2022. He was also a deputized Federal Flight Deck Officer ("FFDO"), which allowed him to carry a government-issued firearm on the flight deck during commercial flights. (Compl. ¶¶ 22, 24.) In August 2022, Captain Banish and Dunn were assigned to fly a rotation together – Banish as Captain (pilot in command) and Dunn as First Officer. (*Id*. ¶ 25.) Captain Banish had never met or flown with Dunn before this flight rotation, but Captain Banish quickly became concerned with Dunn's technical capabilities and temperament. (*See* Ex. A at 290-292, 438-461, 770-798, 860-874.) As one example, Dunn did not react well when Captain Banish corrected him on the procedures during takeoff on the Airbus 320/321 aircraft.

On August 22, 2022, on the final leg of their three-day rotation, Captain Banish and Dunn crewed a flight from Atlanta to Salt Lake City. (Compl. ¶ 28.) Dunn was difficult from the outset and throughout. (Ex. A at 862-63, 866-77; Ex. D.) On the final flight of the rotation, Captain Banish decided to delay pushback and re-open the main cabin door to reunite a father with his children, who were already onboard, even though the father had missed the gate closure while trying to get food in the terminal. At the time of Captain Banish's decision and throughout the flight, Dunn argued that they should have left the father behind to "teach him a lesson." (Ex. A at 702-706, 770-798, 879-948.)

<u>Dunn Threatened to Repeatedly Shoot Captain Banish with His Loaded Firearm, in Response to Captain Banish's Proposal to Divert if the Condition of a Pregnant Passenger Experiencing a Miscarriage Worsened</u>

During the flight, Captain Banish and Dunn learned that a pregnant passenger was having a miscarriage in the bathroom. (Compl. ¶ 29; *see also* Ex. A at 1002-12.) Consistent with proper crew resource management techniques, Captain Banish assessed the situation through a discussion with Dunn, the cabin crew assisting the passenger, Delta's dispatcher, and an on-call physician, to determine if an emergency diversion to Denver, Colorado was necessary. (Compl. ¶ 29; *see also* Ex. A at 1045-1073.) At the time, it was determined that an emergency diversion was not warranted as the passenger's condition appeared to stabilize. (Compl. ¶ 29.) Captain Banish decided to continue to Salt Lake City, while monitoring the situation in case things changed. (*Id.* ¶¶ 40-41; Ex. E.)

After passing Denver, Captain Banish informed Dunn they would divert to Grand Junction, Colorado in the event the passenger's condition deteriorated. Grand Junction is an FAA and Delta-approved alternate airport for their specific plane (an Airbus 321). (Compl. ¶ 30; *see also* Ex. A at 1112-1138.) All Delta pilots, but in particular pilots in command like Captain Banish, are responsible for always having an emergency "Plan B" landing spot in mind, particularly when a medical event could turn into an emergency. (Ex. A at 1139-1148, 1800-1810.) Captain Banish, therefore, was not joking about this possible contingency. (*Id*. at 1800-1810; Ex. D.)

Dunn, as First Officer, would reasonably be expected to immediately assist in the formulation of a backup plan – evaluating circumstances at the alternate destination, including runways, approaches, and landing based on wind direction. (Ex. A at 1138-48; Ex. D.) Instead, Dunn immediately resisted, saying "No we won't." (Ex. A at 1148-1155; Ex. E.)

Captain Banish explained that he was ultimately responsible for making any decision regarding a diversion. (Ex. A at 1155-1160; *see also* 14 C.F.R. § 1.1 (stating that pilot in command "[h]as final authority and responsibility for the operation and safety of the flight").) He noted that of "100 votes in the cockpit" he had 51 votes and Dunn 49. (Ex. A at 1157-1161.) Dunn responded that he did not need 49 or 51 votes because he had "46" – a reference to the fact he was carrying (in full view) a loaded 9 mm Glock with 46 rounds of ammunition (one in the chamber, 15 in the magazine, and 30 combined in his two spare magazines). (*Id*. at 1160-1168; Ex. E.) After some further back and forth, Captain Banish said "I don't know if you're serious or what, um, but we really would go to Grand Junction. I mean just so we're on the team here right now." (Ex. A at 1192-1200.)

Disagreeing with Captain Banish's direction, Dunn said he would "arm wrestle" Captain Banish for the decision and then said "if you were to go to Grand Junction, you know, I would just have to shoot you." (*Id*. at 1203-1211.) Dunn continued on "[a]nd I would shoot you and I would keep shooting you and on . . . [the] cockpit voice recorder . . . they would listen to the CVR and they would wonder why I shot so many times and why I reloaded two times . . . and the first shot was a kill shot, but I still shot you because you kept twitching." (*Id*. 1209-1221.)

Captain Banish, who was aware that Dunn was armed, was not sure whether Dunn was serious or joking, but Captain Banish felt intimidated because he did not know if he "was going to have a gun pointed at [him] at some point." (*Id*. at 1228-1233, 1745-1789.)

Thankfully, the passenger's medical condition did not worsen and a diversion to Grand Junction was unnecessary. (Compl. ¶ 32.) Had they needed to divert, however, Captain Banish did not "honestly . . . know what would have happened." (Ex. A at 1815-1839.) He was "in a

situation where if nothing were to happen with this guy, I wouldn't be surprised, but if there were a serious incident, I would also not be surprised." (Ex. B at 5:23-6:1.)

<u>Captain Banish Immediately Reported Dunn's Alarming Behavior to Delta</u>

After the flight landed in Salt Lake City, Captain Banish immediately reported Dunn's behavior to Salt Lake City Chief Pilot, Captain Kevin Miller. (Compl. ¶ 48.) A report was also made to Regional Director and Western Region Chief Pilot, Captain Brian Cink. (*Id*. ¶ 53.)

Delta investigated the incident, which included an interview of Dunn. Dunn did not deny any of the statements reported by Captain Banish, including those about shooting Captain Banish 46 times until he stopped twitching, but instead tried to downplay them as jokes. (*Id.* at ¶¶ 35, 64, 75; Ex. E.)

Delta concluded that Dunn's conduct warranted termination. (Ex. E.) His statements violated Delta's Workplace Violence Policy, which expressly prohibits, in relevant part, "threatening or intimidating comments or gestures (even said in jest), threatening or intimidating pranks, jokes . . . and actual or threatened physical contact." (*Id*.) Delta concluded that "[t]hreats of murder by gunshot by someone armed with a handgun and trained to use it could never be perceived as a joke." [3] (*Id.*)

Not only did Dunn's threats violate Delta's Workplace Violence Policy, they were also a serious distraction and detracted from the safe, effective operation of the flight. They undermined Delta's essential Crew Resource Management procedures regarding in-flight safety and increased the likelihood of pilot error, which is particularly troubling at a time when the

---

[3] The Transportation Security Agency ("TSA"), which administers the FFDO program, considered the incident so severe that they showed up on Dunn's doorstep to confiscate his credentials and service weapon.

crew needed to focus on making its approach into Salt Lake City. (*Id*.) Delta concluded that Dunn's comments were the culmination of three days of unprofessional and unsafe conduct, which included numerous other deviations from Delta's standard operating procedures. (*Id.*) Ultimately, Dunn resigned in lieu of termination. (Complaint ¶¶ 80-84.)

<u>Captain Banish Reports Dunn's Misconduct to Federal Law Enforcement</u>

Captain Banish meanwhile was not sure how to report Dunn's conduct to law enforcement, but he ultimately determined that the FBI was the appropriate entity. He called the FBI's tip line on August 25, 2022. (Compl. ¶ 61; Ex. D at 161-167.) On the call with the FBI intake agent, Captain Banish reported Dunn's statement about shooting him until he stopped twitching. Captain Banish said Dunn "jokingly suggested that he did not agree with [his] decision . . . and would have to shoot [him] and claim [he] had gone crazy." (Ex. B at 3:21-4:2.) Captain Banish acknowledged that he did not "know if [Dunn] was joking or serious." (*Id*. at 4:8-5:11.) But he told Dunn, "I'm sure you're joking here, but the guy with a gun doesn't get to joke about shooting the captain in the airplane. And he didn't really have a response." (*Id.* at 5:12-16.)

Captain Banish then added, "So part of the reason for my call is, I guess, number one, just to report this incident. And there is an element that – there's something that just seems off about this individual. He doesn't seem completely normal to me. And I guess I'm in a situation where if nothing were to happen with this guy, I wouldn't be surprised, *but if there were a serious incident, I would also not be surprised.*" (*Id.* 5:17-6:1 (emphasis added).)

Several months later, Captain Banish sat for an interview with federal investigators and an Assistant United States Attorney for the District of Utah, at their request, to recount his

experience with Dunn. (Compl. ¶ 89; Ex. A.) When asked if he thought Dunn was joking or being sarcastic when he made the statement about shooting Captain Banish, Captain Banish confirmed multiple times that he did not know, and was in no position to know, whether Dunn was being serious or not. (Ex. A at 918-920 ("[A]gain I don't know if he was joking . . . . so three months later if you were to ask me do I think that you were joking, I – I – I – I don't know"), 1774-1789 (explaining that he did not know if it was sarcasm and adding "I mean had we diverted to Grand Junction – I mean was I going to have a gun pointed at me at some point?  I mean I – I don't know . . . . I really don't know."), 1815-1839 (noting that "had we had to go to Grand Junction, I honestly don't know what would have happened").)

When law enforcement discussed potential charges against Dunn, Captain Banish stated, "To be honest, that's – that's just your . . . department. I'm just . . . a guy telling you what happened." (*Id*. at 129-143.) And in response to questions about whether Captain Banish was intimidated, he explained that he was not "trying to insert emotion . . . or speculation into . . . anything" but that "if [he] knew the guy was going to point a gun at me because [we]'re going to divert . . . [then] yes, it was intimidat[ing]." (*Id*. at 2214-2217.) But if it was determined the "guy [was] just an idiot – with a gun, who is a moron" it would be up to law enforcement to decide if a "moron" should go to jail for being a "moron." (*Id*. at 2217-222.) Captain Banish concluded that he was in no position to know if Dunn was joking or not, but that Dunn did not say he was joking. (*Id*. at 2278-2295.) Again, Dunn *very selectively* quotes a word here or there from this interview, hoping to ignore all context and what was actually said.

Captain Banish has always been consistent that he did not and could not know if Dunn was joking. In reality, the fact that he could not know seems self-evident to the point that it is

unclear if Captain Banish could even be asked what Dunn was thinking without drawing an objection at trial. Captain Banish very clearly communicated this sentiment to law enforcement over and over.

Dunn is Indicted

A federal grand jury indicted Dunn on October 18, 2023, for felony interference with a flight crew using a dangerous weapon. (Compl. ¶ 91.) In connection with Dunn's indictment, federal prosecutors filed their "Position Regarding Detention," in which prosecutors, without any quote attributed to Captain Banish, stated that Captain Banish did not consider Dunn's statements to be a joke. (Ex. C.)

On January 29, 2024, federal prosecutors and law enforcement officers again interviewed Captain Banish, memorializing the interview in a written report that expressly acknowledged that the summary "is not intended to be a verbatim account and does not memorialize all statements made in the interview." (Ex. D at 3.) The summary notes that Captain Banish "felt" Dunn was serious, that he "did not know what Dunn would do" had the decision been made to divert the flight to Grand Junction, and that he felt threatened by Dunn's conduct. (*Id*. at 2-3.)

On August 16, 2024, the United States Attorney's Office filed its Motion for Leave to Dismiss the Indictment Without Prejudice. (Motion to Dismiss, Case No. 2:23-cr-00375, Dkt. 155.) The case was dismissed without prejudice on August 16, 2024. (Dismissal of Felony Indictment Without Prejudice, Case No. 2:23-cr-00375, Dkt. 160.)

<u>**ARGUMENT**</u>

I. **DUNN'S CLAIMS ARE BASED ON THE DELTA DEFENDANTS' PROTECTED PUBLIC EXPRESSION AND ARE THUS BARRED BY UTAH'S UNIFORM PUBLIC EXPRESSION PROTECTION ACT.**

A. <u>**Utah Law Protects Against Retaliatory Lawsuits Meant to Stifle Free Speech**</u>.

During its 2023 legislative session, Utah adopted the Uniform Public Expression Protection Act ("UPEPA") to combat strategic lawsuits against public participation ("SLAPPs"). *See* Utah Code Ann. § 78-25-101.[4] SLAPPs "are often cloaked as otherwise standard claims of defamation, civil conspiracy, tortious interference, nuisance, and invasion of privacy, just to name a few." *See Bliss v. UHS of Provo Canyon, Inc.*, 2024 WL 4279243, \*3 (D. Utah Sep. 24, 2024) (citing Uniform Law Commission, Uniform Law and Commentary, § 1 cmt., Ex. F.) "'But for all the ways in which SLAPPs may clothe themselves, their unifying features make them a dangerous force: Their purpose is to ensnare their targets in costly litigation that chills society from engaging in constitutionally protected activity.'" *Id.* (citation omitted). UPEPA, in turn, is designed to prevent "the impairment of First Amendment rights and the time and expense of defending against litigation that has no demonstrable merit." *Id.*

The protections of UPEPA apply to various forms of expression, including a person's right to participate in governmental proceedings and to make statements concerning issues under review in governmental proceedings. *Id.* at § 78B-25-102(2). Courts are directed to "broadly" construe and apply UPEPA "to protect the exercise of the right of freedom of speech and of the

---

[4] UPEPA "should be considered an anti-SLAPP act." Uniform Law Commission, Uniform Law and Commentary, § 1 cmt., attached hereto as Exhibit F.

press, the right to assemble and petition, and the right of association, guaranteed by the United States Constitution or the Utah Constitution." *Id.* at § 78B-25-111.[5]

Although UPEPA contains procedural elements, it applies in "federal diversity actions because it exists to influence substantive outcomes and is so bound up with the state-created right or remedy that it defines the scope of the substantive right or remedy." *Caranchini v. Peck*, 355 F.Supp.3d 1052, 1061 (D. Kan. 2018) (analyzing multiple other state anti-SLAPP statutes and concluding that where the anti-SLAPP statute exists to influence substantive outcomes . . . the court may apply anti-SLAPP in the diversity context); *Bliss*, 2024 WL 4279243 at *4-5 (applying UPEPA to state-law claims in this Court).

"In federal court, UPEPA requires a two-part analysis." *Bliss*, 2024 WL 4279243 at *4; *Albustani v. Alger*, No. C22-5238JLR, 2022 WL 3213331, at *4 (W.D. Wash. Aug. 9, 2022) (construing UPEPA and applying the Federal Rule of Civil Procedure 12(b)(6) standard to consider whether a claim is properly stated). First, the Court must determine whether UPEPA applies to the action. Utah Code § 78B-25-107(1)(a). Second, the Court must determine whether Dunn has a legally viable cause of action—*i.e.*, whether he "failed to state a cause of action upon which relief can be granted." Utah Code § 78B-25-107(1)(c)(ii)(A). In this case, the Delta Defendants can establish both prongs of this test. Consequently, "the court must dismiss the action and 'award court costs, reasonable attorney fees, and reasonable litigation expenses related to this motion'" to the Delta Defendants. *Bliss*, 2024 WL 4279243 at *4.

---

[5] The statute also provides that "[i]n applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to the uniform law's subject matter among states that enact the uniform law." Utah Code Ann. § 78B-25-112. To date, seven states (Hawaii, Kentucky, New Jersey, Oregon, Utah, Washington, and Maine) have enacted UPEPA.

**B.** **Dunn's Claims Sit Squarely Within the First Step of UPEPA.**

First, both Dunn's defamation and malicious prosecution claims fall squarely within the

ambit of UPEPA. Indeed, both claims are based entirely on statements that Captain Banish made

to law enforcement when he reported Dunn's suspected criminal behavior. This is precisely the

type of speech protected from retaliation by state anti-SLAPP laws. *See, e.g., Mouktabis v.*

*Clackamas County*, 536 P.3d 1037, 1046 (Or. App. Ct. 2023) (dismissing malicious prosecution

claim under an anti-SLAPP statute and noting that "when [the defendant] made her report to the

police . . . she was requesting assistance from the state . . . . Thus, the 'arise out of' requirement

is satisfied.")[6]; *Caranchini*, 355 F. Supp. 3d at 1062 (concluding that the protection of the anti-

SLAPP act extends to sharing information with a prosecutor); *Hindu Temple & Cmty. Ctr. of*

*High Desert, Inc. v. Raghunathan*, 714 S.E.2d 628, 632 (Ga. App. 2011) (noting that statements

made in furtherance of police investigation are protected by anti-SLAPP statute); *Pylypenko v.*

*Bennett*, No. CV-09-690, 2011 WL1338088 (Me. Super. Ct. 2011) ("Reporting an alleged crime

to the police is clearly the sort of petition to a government body that [Maine's anti-SLAPP law]

is designed to protect."); *Benoit v. Frederickson*, 908 N.E.2d 714, 718 (Mass. 2009) (report to

police "which initiates the filing of a criminal complaint, is a petitioning activity" for purposes of

anti-SLAPP statute); *see also* Uniform Law Commission, Public Expression Protection Act

Uniform Law and Commentary § 2 cmt. 7, Ex. F (noting that the uniform law "protects . . .

effectively, any speech or expressive conduct that would implicate one's right to petition the

government").

---

[6] Although Oregon has now enacted the Uniform Public Expression Protection Act, *Mouktabis*
was decided under a prior, non-uniform anti-SLAPP statute. *See Mouktabis*, 536 P.3d at 766.
Regardless, making reports to law enforcement qualify as a "petition" to the government.

As Dunn concedes, a malicious prosecution claim requires that the defendants "initiated or procured the initiation of criminal proceedings" (Compl. ¶ 125) – an action that necessarily requires a communication in a "judicial . . . or other governmental proceeding," or "on an issue under consideration or review in a . . . judicial . . . or other governmental proceeding." Utah Code § 78B-25-102(2). Likewise, Dunn's defamation claim is wholly based on statements Captain Banish allegedly made to government "investigators" and "prosecutors." (Compl. ¶ 141.)

**C.**      **Dunn Fails to State a Claim Upon Which Relief May Be Granted, as Required by the Second Step of UPEPA.**

As set forth in detail below, Dunn has failed to state a cause of action against the Delta Defendants upon which relief can be granted. Utah Code § 78B-25-107(1).

**II.**      **PLAINTIFF FAILS TO STATE ANY CLAIM AGAINST THE DELTA DEFENDANTS UPON WHICH RELIEF MAY BE GRANTED**

As set forth herein, each of Plaintiff's claims fail as a matter of law and must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

Importantly, "[d]etermining whether a complaint states a plausible claim for relief" is a "context-specific task." *Iqbal*, 556 U.S. at 679. Generally, "a court considers only the contents of

the complaint when ruling on a 12(b)(6) motion, but exceptions to this general rule include the following: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and matters of which a court may take judicial notice." *Clinton v. Security Benefit Life Ins. Co*., 63 F.4th 1264, 1275 (10th Cir. 2023) (citations omitted) (cleaned up). The Complaint specifically refers to several documents, including those purporting to contain or summarize statements from Captain Banish upon which Dunn's claims are based. Because such documents are incorporated by reference and central to Dunn's claims, the Court may properly consider them.

A.   **All of Plaintiff's Claims Against the Delta Defendants Are Barred By the Aviation and Transportation Security Act**.

Congress specifically adopted ATSA to encourage airlines and their employees, like the Delta Defendants, to report suspicious activities to law enforcement without hesitation, and to protect them from *any* civil liability for making truthful reports. Specifically, ATSA states:

> Any air carrier . . . or any employee of an air carrier . . . who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to . . . a threat to aircraft or passenger safety . . . to any employee or agent of the Department of Transportation, the Department of Homeland Security, the Department of Justice, any Federal, State, or local law enforcement officer . . . **shall not be civilly liable** to any person **under any law** or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure.

49 U.S.C. § 44941(a) (emphasis added).

Other than disclosures "made with actual knowledge that the disclosure was false, inaccurate, or misleading" or otherwise made with "reckless disregard as to the truth or falsity of that disclosure" immunity granted under this section is absolute. *Id*.; *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015) (noting ATSA provides immunity from liability for reporting suspicious activity relating to, among other things, a threat to aircraft or passenger

safety, "unless the report was materially false"); *Air Wisc. Airlines v. Hoeper*, 571 U.S. 237, 248-249 (2014) (holding that "ATSA immunity may not be denied under § 44941(b) to materially true statements").

"Implicit in immunity for making reports to law enforcement is immunity from liability for whatever law enforcement might do with those reports." *Bandary v. Delta Air Lines, Inc.*, No. 2:17-CV-1065-DSF, 2019 WL 9244788, * 3 (C.D. Cal. Oct. 11, 2019). "Otherwise, immunity would be largely meaningless." *Id*.

     i.     <u>The Purpose of the Immunity Provision in ATSA is to Increase Safety in Air Travel</u>.

After the airline attacks on 9/11, Congress acted swiftly to pass ATSA, making the TSA responsible "for assessing and investigating possible threats to airline security." *Hoeper*, 571 U.S. at 248 (citation omitted). "In directing the TSA to 'receive, assess, and distribute intelligence information related to transportation security . . . Congress wanted to ensure that air carriers and their employees would not hesitate to provide the TSA with information it needed." *Id*. at 248-49. The express purpose of the immunity provision is "encouraging airline employees to report suspicious activities." *Id*. at 249. "It would defeat this purpose to deny immunity for substantially true reports, on the theory that the person making the report had not yet gathered enough information to be certain of its truth. Such a rule would restore the pre-ATSA state of affairs, in which air carriers bore the responsibility to investigate and verify potential threats." *Id*.

     ii.     <u>The Delta Defendants are Immune from Civil Liability for All Reports of Dunn's Threats to Law Enforcement</u>.

Captain Banish and the other Delta Defendants are explicitly immune from liability for all of Captain Banish's reports to law enforcement pursuant to ATSA. 49 U.S.C. § 44941(a); *see*

*also Baez*, 793 F.3d at 274; *Hoeper*, 571 U.S. at 248-49. In the context of ATSA, a materially false statement is one that would have a different effect on the mind of the . . . listener from that which the truth would have produced." *Baez*, 793 F.3d at 274 (citation omitted). "The 'listener' is a reasonable security officer" and the relevant inquiry is "whether a falsehood affects the authorities' perception of and response to a given threat." *Id*. In other words, a "falsehood cannot be material, for purposes of ATSA immunity, absent a substantial likelihood that a reasonable security officer would consider it important in determining a response to the supposed threat." *Id*. at 275-76 (citing *Hoeper*, 571 U.S. at 252).

Dunn bases his claims against the Delta Defendants on the following three alleged communications from Captain Banish to law enforcement:

1.   On December 15, 2022, "Banish told investigators in an interview that he 'was not sure' whether Dunn was joking." (Compl. ¶ 141(a); *see also* Ex. A.)

2.   On or about December 29, 2023, "Banish told prosecutors in an interview that he 'did not consider [Dunn's comments] a joke.'" (Compl. ¶ 141(b); *see also* Ex. C.)

3.    On or around January 29, 2024, "Banish told prosecutors in an interview that he 'did not think' Dunn was joking." (Compl. ¶ 141(c); *see also* Ex. D.)

Dunn alleges that these three statements to law enforcement were false because Captain Banish "knew" that Dunn was joking, and Captain Banish allegedly lied when he told law enforcement that he was not sure if Dunn was joking or not. (Compl. ¶¶ 128(a), 142(a).) The statements made by Captain Banish cannot, as a matter of law, serve as the basis of liability for the Delta Defendants as they were a truthful recounting of what happened from Captain Banish's perspective. In any event, whether Captain Banish actually believed Dunn's statements to be threatening (or not) is irrelevant to the broad application of ATSA immunity to the purportedly defamatory statements at issue here.

The thorough *Baez* decision analyzing the scope of ATSA immunity in the context of a passenger who asked a snarky, hypothetical question about her bag having a bomb in it, is dispositive that Captain Banish's statements fall squarely within ATSA's broad immunity. In *Baez*, the plaintiff was not permitted to board her flight because the gate had just closed. She then asked the gate agent what would happen if there was a bomb in her bag, which was on the plane without her. *Baez*, 793 F.3d at 274-76. The passenger claimed that "she raised only a hypothetical question about the security risk posed by a checked bag unaccompanied by its owner, which might contain a bomb." *Id*. at 275. The JetBlue employee, who did not personally consider the passenger to be a security risk, reported to her supervisor (who, in turn, reported to airline security and the TSA) that the passenger implied there was a bomb in her bag. *Id*. at 272-73. After her criminal arrest, the passenger sued the gate agent and the airline for defamation, among other claims. *Id.* at 271-72. She asserted that the gate agent purposefully misrepresented the conversation to convey that the passenger had stated that there was a bomb in her bag. *Id.* at 272.

The court recognized that an airline employee "may not confidently distinguish between a veiled threat and a comment expressing genuine concerns about security" which is why "once a report is made, it is for the TSA and law enforcement 'to determine and execute a response.'" *Id*. at 275. "At an airport, a bare reference to a bomb may be enough to set off the chain of events" that resulted in the plaintiff's detention and arrest by the FBI. *Id*. Therefore, "a passenger who speculates aloud about whether there is a bomb in her luggage cannot be heard to complain when an airline representative reports use of those words, even if the passenger's precise words are misrepresented." *Id*. at 275-76.

For these reasons, the court held that whether the airline employee precisely relayed the passenger's statement to law enforcement and/or whether the passenger was an actual threat to airline safety, is immaterial to whether the employee's report was "materially true" and thus immune. *Id*. at 276. The court concluded that requiring an airline employee to "relay the 'precise wording' of a potential security threat 'would vitiate the purpose of ATSA immunity.'" *Id*. at 275. And because the "standard is an objective one, involving the hypothetical significance of an omitted or misrepresented fact to a reasonable security official" the inquiry is whether a "reasonable security officer" would follow up on the report regardless of the reporting employee's assessment of the legitimacy of the threat. *See id*. at 276 ("Any reasonable security officer would follow up on a report of a disgruntled passenger who adverted to a bomb in luggage and deprecated the agency responsible for detecting such bombs.").

So too here, any "reasonable security officer" would absolutely follow up on a report of an armed pilot who told the Captain of the flight that he would shoot him 46 times until he stopped twitching, regardless of whether the pilot "could" be joking. Under no construction of the facts could a security officer be considered "reasonable" if he or she did not follow up on this type of threat, particularly when Dunn was armed and had the present ability to shoot his weapon 46 times. Furthermore, Dunn does not dispute that he made these statements to Captain Banish after Captain Banish notified Dunn of his intent to divert to Grand Junction if the medical condition in the cabin worsened. *Cf.* Baez, 793 F.3d at 275-76 (applying ATSA immunity "even if the passenger's precise words are misrepresented"). This concession ends the inquiry. Like the word "bomb," a "bare reference" to shooting the Captain with a gun onboard an aircraft is sufficient to trigger the investigative action of any "reasonable security officer," regardless of

Dunn's own state of mind. *Id.* Moreover, Dunn's attempt to ignore all context surrounding his statements by omitting his actual comments in the Complaint and suggesting it was just a joke necessarily fails. A "reasonable security officer" would, at minimum, interview relevant witnesses to assess whether the comments were a joke, and even if intended as a joke, assess whether the "joke" still interfered with the duties of a crew member.

Thus, the "precise wording" (or intent) of Dunn's statements is wholly immaterial to the question of whether Captain Banish and the remaining Delta Defendants are entitled to immunity under ATSA. *Id.* at 275-76. Put simply, Dunn never denied that he made the statements reported by Captain Banish despite repeated opportunities to do so at Delta, in the underlying criminal case, and even his current Complaint. Thus, Captain Banish's reports to law enforcement were materially true, and therefore subject to ATSA immunity. As such, Dunn's Complaint fails to state a claim upon which relief may be granted and must be dismissed entirely as against all the Delta Defendants.

Even assuming, for the sake of argument, that Captain Banish had some impossible degree of insight into Dunn's state of mind at the time the statements were made, ATSA immunity still applies based on Dunn's own allegations. The crux of Dunn's Complaint is that Captain Banish's initial call to the FBI was accurate and that subsequent statements were false and contrary to the initial FBI call. (Compl. ¶¶ 61, 128(a).) But "[i]mplicit in immunity for making reports to law enforcement is immunity from liability for whatever law enforcement might do with those reports." *Bandary*, 2019 WL 9244788, at *3. Otherwise, "immunity would be largely meaningless" as the purpose of ATSA "is to encourage reports to law enforcement." *Id.* That purpose "would be clearly undercut if airlines and airline personnel would be potentially

liable for the independent actions of law enforcement after a report was made." *Id*. Said differently, the ATSA is one of several post-9/11 "see something, say something" statutes that absolutely seek to encourage – not "chill" – reporting. Dunn effectively would turn the ATSA into a "see something, say something, get sued" statute. For that reason, if, as Dunn alleges, the initial call to the FBI reflected true statements by Captain Banish, then Captain Banish and the Delta Defendants are immune "from liability for whatever law enforcement [did] with [his] reports." *Bandary*, 2019 WL 9244788, at *3; *see also Ilczyszyn v. Southwest Airlines Co.*, 80 Cal.App.5th 577, 601 (Cal. Ct. App. 2022) (holding that ATSA immunity "may be extended to the conduct that arises from security threat disclosures" because limiting the immunity to reports of suspicious activity only would turn "TSA's 'when in doubt, report' policy on its head"). That federal prosecutors requested to meet with Captain Banish multiple times and subpoenaed Captain Miller and Captain Cink to testify at Dunn's criminal trial, are all immunized acts by law enforcement flowing from Captain Banish's call to the FBI that Dunn concedes was truthful.

Each of Captain Banish's reports to law enforcement regarding Dunn's conduct, including his call to the FBI in August 2022, his interview by law enforcement on December 15, 2022, and his interview with law enforcement on January 29, 2024, are immune under ATSA. *See* 49 U.S.C. § 44941. With the exception of Captain Banish's initial call to the FBI, all subsequent conversations were requested and initiated by law enforcement. And, as discussed previously, each statement Captain Banish made to law enforcement was consistent and

materially true. Because the Delta Defendants are immune from *any liability*, the Complaint must be dismissed in its entirety.[7]

**B.** **Dunn Fails to State a Viable Claim of Defamation.**

Dunn's claim for defamation against Captain Banish and Delta fails as a matter of law. To state a claim for defamation, a plaintiff must show that (1) the defendants published the statements at issue concerning him; (2) the statements were false and defamatory; (3) the statements are not subject to any privilege and were published with the requisite degree of fault; and (4) the publications resulted in damage. *See West v. Thomson Newspapers*, 872 P.2d 999, 1007-08 (Utah 1994).

---

[7] For the same factual and policy reasons underlying the Delta Defendants' complete immunity pursuant to ATSA, the Delta Defendants' alleged conduct is also protected by Petition Clause immunity. *See Holmes v. Crown Asset Magmt.*, LLC, No. 2:19-cv-00758, 2021 WL 3473050, at *2 (D. Utah Aug. 6, 2021) (acknowledging that "[t]he First Amendment guarantees the people a right 'to petition the Government for redress of grievances.'"); *see also CSMN Investments, LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1283 (10th Cir. 2020) ("In this circuit, this immunity extends beyond antitrust situations"). In short, the Petition Clause immunizes litigants from liability for their petitioning activities. *Id.* In this case, Dunn's allegations against the Delta Defendants, which form the basis of both his defamation and malicious prosecution claims, are based entirely on Captain Banish's reports to law enforcement about Dunn's threat, which Captain Banish believed might constitute criminal conduct. *GoSecure Inc. v. Bhandari*, 637 F. Supp. 3d 368, 380 (E.D. Va. 2022) (applying Noerr-Pennington protection to claim of malicious prosecution); *Caixa Geral de Depositos, S.A. v. Rodrigues*, 2005 WL 1541055 * 11 (D.N.J. 2005) (applying the Noerr-Pennington Doctrine to defamation claims). Captain Banish's reports are all protected petitions for government redress and are immune from liability. *Forro Precision, Inc. v. Int'l Bus. Machines Corp.*, 673 F.2d 1045, 1060 (9th Cir. 1982) (holding "that the Noerr-Pennington doctrine applies to citizen communications with police"). Indeed, "as the Ninth Circuit has persuasively explained, the interests embodied by the Petition Clause are 'served by ensuring the free flow of information to the police.'" *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85, 90 (D.C. Cir. 2015). And it "would be difficult indeed for law enforcement authorities to discharge their duties if citizens were in any way discouraged from providing information." *Id.* (recognizing that "those considerations support applying the Noerr–Pennington doctrine 'to citizen communications with police'").

Here, the "threshold issues" are (1) "whether any qualified or absolute privileges preclude [Dunn's] claim," and (2) "whether the [alleged] statements are capable of sustaining a defamatory meaning." *Id*. at 1008. The Utah Supreme Court has recognized "a First Amendment interest in disposing of libel cases on motion and at an early stage when it appears that a reasonable jury could not find for the plaintiffs." *Cox v. Hatch*, 761 P.3d P.2d 556, 561 (Utah 1988) (affirming dismissal for failure to state a claim).

Dunn's defamation claim fails as a matter of law for multiple reasons. First, the allegedly defamatory statements are protected statements made in the course of judicial proceedings. Second, the alleged statements are incapable of sustaining a defamatory meaning under Utah common law. Finally, as a matter of law, the allegedly defamatory statements are protected opinion under the Utah Constitution.

  i. <u>Each Alleged Defamatory Statement is Protected by the Judicial Proceedings Privilege</u>.

A threshold issue the Court must consider is whether the alleged false and defamatory statements are subject to any privilege. "Under Utah law, false and defamatory statements are not actionable if they are protected by a legal privilege, including the judicial-proceeding privilege." *Bramhall v. Cyprus Credit Union*, No. 2:29-cv-00477-RJS-DAO, 2021 WL 5180945, *7 (D. Utah Jan. 25, 2021) (quotations and citation omitted). This privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding process [and does so by facilitating] the 'free and open expression by all participants . . . [which] will only occur if they are not inhibited by the risk of subsequent defamation suits." *DeBry v. Godbe*, 992 P.2d 979, 983 (Utah 1999). "Utah courts interpret the term 'judicial proceeding' broadly . . . and extend the privilege

to "communications preliminary to a proposed judicial proceeding as well as during the course of or as part of a judicial proceeding." *Bramhall*, 2021 WL 5180945 at *7 (citation omitted).

To establish that statements are protected by the judicial proceeding privilege, the statements must be "(1) made during or in the course of a judicial proceeding; (2) have some reference to the subject matter of the proceeding; and (3) made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *Id*. (citation omitted).

Dunn alleges that Captain Banish made three defamatory statements ("Statements"), all of which were to federal prosecutors and federal investigators:

1. On December 15, 2022, "Banish told investigators in an interview that he 'was not sure' whether Dunn was joking." (Compl. ¶ 141(a).)

2. On or about December 29, 2023, "Banish told prosecutors in an interview that he 'did not consider [Dunn's comments] a joke.'" (*Id*. ¶ 141(b).)

3. On or around January 29, 2024, "Banish told prosecutors in an interview that he 'did not think' Dunn was joking." (*Id*. ¶ 141(c).)[8]

There is no dispute that each of the alleged Statements was made to federal investigators and federal prosecutors "in the course of a criminal investigation and prosecution" – the first in response to questions by law enforcement in its investigation and consideration of criminal charges against Dunn, and the latter two after Dunn was indicted for his threats. (*Id*. ¶¶ 141(a)-(c), ¶ 191.) Because the Statements were made during the course of a judicial proceeding, they are all privileged. *Bramhall*, 2021 WL 5180945 at *8 (holding that witness statements made in

---

[8] Dunn's cites to the December 29 Detention Memorandum and the Jan. 29 Summary for the alleged defamatory statements in paragraphs 2 and 3 are not quotes of Captain Banish's actual statements. Rather, the Detention Memorandum contains law enforcement's arguments and the Jan. 29 Summary explicitly paraphrases the contents of the interview and is not a "verbatim account." (*See* Exs. C and D.) Thus, Dunn's allegations are not based on Captain Banish's actual statements themselves but law enforcement's characterization and/or summary of the same, which cannot be defamatory. (*Id*.)

the course of a criminal investigation and prosecution fall within the scope of the judicial proceedings privilege under Utah law). Consequently, Dunn's defamation claim fails as a matter of law and should be dismissed.

      ii.      <u>Captain Banish's Allegedly Defamatory Statements are Incapable of Sustaining a Defamatory Meaning</u>.

Another threshold issue the Court must consider is "whether the statements are capable of sustaining a defamatory meaning," which is a question of law. *West*, 872 P.2d at 1008.

"At its core, an action for defamation is intended to protect an individual's interest in maintaining a good reputation." *Id*. "A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning." *Id*. at 1009 (citation omitted). "A court cannot limit its analysis to isolated words or sentences. Instead, it must weigh competing definitions and make sense of context without indulging inferences in favor of the nonmoving party and decide whether the statements tend to injure the plaintiff's reputation in the eyes of its audience." *Pipkin v. Acumen*, 2020 UT App 111, ¶ 16, 472 P.3d 315 (cleaned up) (quotation and citation omitted); *see also Hogan v. Winder*, 762 F.3d 1096, 1106 (10th Cir. 2014) (noting that the Court "can, and must, conduct a context-driven assessment of the alleged defamatory statement and reach an independent conclusion about the statement's susceptibility to a defamatory interpretation." (citation omitted).) This is exactly what the Delta Defendants ask this Court to do.

Dunn does not dispute in his Complaint (and has never disputed) that he told Captain Banish that if Captain Banish decided to divert to Grand Junction, Dunn "would have to just shoot [him]." (Ex. A at 1211-1213.) Nor does he dispute that at the time he said this he was fully

armed and capable of doing so, and he referred to his 46 bullets as "votes" not to divert. Finally, he cannot dispute that he said that although "the first shot [would be] a kill shot," he would explain that the reason he kept shooting Captain Banish 46 times was because Captain Banish "kept twitching." (*Id.* at 1162-55:1221; Compl. ¶ 35.) Dunn's only quibble is with Captain Banish's stated uncertainty about whether Dunn was joking. (Compl. ¶¶ 141.)

First, it flies in the face of common-sense that someone saying "I don't know" in response to a question from law enforcement could somehow be a "defamatory statement." That someone claiming a lack of knowledge or information on a particular subject could be accused of making an affirmative false statement is nonsensical. This is especially true where it is a factual impossibility for Captain Banish to have known *what Dunn meant* by his statements.

Second, to make any conclusions regarding Dunn's character or reputation, a reasonable person would not need to look to Captain Banish's assessment as to whether Dunn was joking about repeatedly shooting him midflight. Rather, to the extent Dunn has been exposed to any public contempt or ridicule, it is his own undisputed statement itself – that he would shoot Captain Banish 46 times until he stopped twitching – that has been the cause of any reputational damage. Indeed, he made that outrageous statement while piloting a commercial aircraft and while wearing a loaded handgun on his hip. It is entirely clear what is going on here – it is no surprise that someone who would make the kind of outrageous statements that Dunn made, would also refuse to take any responsibility for his own actions and statements, and instead try to shift the blame to the recipient of his outrageous statements.

Captain Banish's statements of uncertainty about whether Dunn was joking, which are the only statements at issue in this case, are incapable of sustaining a defamatory meaning. *West*, 872 P.2d at 1008-09. Dunn's defamation claim fails for this reason as well. *Id.*

iii. The Alleged Defamatory Statements are Inactionable Opinion.

Since its founding, and for reasons dating back to its constitutional convention, Utah has provided robust constitutional protections for expressions of opinion. The Utah Supreme Court explained in *West*:

> Opinions are inherently incapable of verification; they embody ideas, not facts. . . . More importantly, expressions of opinion are the mainstay of vigorous public debate. Without opinion, such debate is virtually nonexistent. . . . Because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability.
>
> * * *
>
> An obvious potential for quashing or muting free speech looms large when fact finders attempt to assess the truth of a statement that admits of no method of verification. We will not risk quashing or muting free speech in this manner.

872 P.2d at 1014-15, 1019 (quotation simplified).

Key to a successful defamation claim is that the statements at issue are "false." *Id.* at 1007; *see also Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535. A plaintiff is "definitionally unable to meet this requirement with regard to statements of pure opinion, because such statements 'are incapable of being verified' and therefore cannot serve as the basis for defamation liability.'" *Davidson v. Baird*, 2019 UT App 8, ¶¶ 31, 438 P.3d 928 (citing *West*, 872 P.2d at 1015). In examining whether Dunn has met his burden on the required element of falsity, the Court "must determine whether any of the statements at issue here constitute protected expression of opinion, and if so, whether any of those opinions state or imply underlying facts

that might be considered defamatory." *Id.* ¶ 31 (citing *Spencer v. Glover*, 2017 UT App 69, ¶ 8, 397 P.3d 780).

Dunn does not dispute that he told Captain Banish that he would shoot him until he stopped twitching, to avoid an emergency diversion. (Compl. ¶ 35.) Dunn claims that Captain Banish defamed him by stating that he was not sure whether Dunn was joking (*Id.* ¶ 141), leaving the possibility that Dunn might have been serious about intending to shoot Captain Banish, if they diverted.

Captain Banish's statements that (1) he was not sure whether Dunn was joking; (2) he did not consider Dunn's comments a joke; and (3) he did not think Dunn was joking, are all statements of pure opinion incapable of verification. *West*, 872 P.2d at 1018-19. Indeed, whether Dunn was actually joking (or not) and whether he would have actually engaged in violence had Captain Banish elected to divert, cannot be objectively verified.

First, Captain Banish was not in Dunn's head and there is no way he could know for certain whether Dunn was joking or not. Anything Captain Banish said in this regard can only be opinion. Second, as Captain Banish clearly explained to law enforcement, because they did not end up having to divert to Grand Junction, he could not know whether Dunn was joking – the condition precedent under which Dunn said he would shoot Captain Banish never occurred. (Ex. A at 1764-1799.)

This is matter is not unlike *Turner v. Wells*, in which Jim Turner, a former offensive line coach for the Miami Dolphins sued the Paul Weiss law firm for defamation based on statements included in the firm's report following an investigation of alleged bullying and harassment in the Dolphin's locker room. 879 F.3d 1254 (11th Cir. 2018). Among other things, the firm's report

concluded that Coach Turner had engaged in misconduct by gifting a player a male blow-up doll. *Id.* at 1263-64. The Dolphins terminated Coach Turner's employment, and he sued Paul Weiss for defamation, alleging that the firm misconstrued his gift as "homophobic taunting," instead of the harmless "joke" which the players purportedly understood it to be. *Id.* at 1264.

The Eleventh Circuit affirmed the dismissal of Coach Turner's defamation claim under Rule 12(b)(6). *See id.* at 1260, 1262. The court concluded that the report's statement that Coach Turner participated in homophobic taunting was "an opinion and not actionable in a defamation suit." *Id.* at 1264, 1270. That statement was "the Defendants' subjective assessment of Turner's conduct and is not readily capable of being proven true or false." *Id.* (noting that Turner's argument that someone else might come to a different conclusion upon review of the facts – that the gift was a joke – does not make the Defendants' assessment of Turner's acts anything other than opinion). Indeed, it is well-settled law that "commentary or opinion based on accurate facts . . . 'are not the stuff of libel.'" *Id.* (citation omitted)).

Here, Captain Banish's commentary or opinion on Dunn's undisputed comments cannot be the basis for a defamation claim. It is entirely unverifiable whether Dunn was joking, and Captain Banish's statements to law enforcement opining on the same are inactionable opinions. *West*, 872 P.2d at 1018-19. Thus, on this additional basis, Dunn's defamation claim must be dismissed as a matter of law.

**C.    Dunn's Malicious Prosecution Claim Fails as a Matter of Law and Must Be Dismissed.**

A claim for malicious prosecution requires proof of four elements: (1) the defendant initiated or procured the initiation of criminal proceedings against an innocent plaintiff; (2) the defendant did not have probable cause to initiate the proceedings; (3) the defendant initiated the

proceedings primarily for a purpose other than that of bringing an offender to justice; and (4) the proceedings terminated in favor of the accused. *Neff v. Neff*, 2011 UT 6, ¶ 52, 247 P.3d 380.

i.   The Delta Defendants Did not Initiate or Procure Criminal Proceedings Against an "Innocent Plaintiff."

"To prove that a defendant instituted the criminal proceeding, a plaintiff must show that the defendant was actively instrumental in putting the law in force." *Amica Mut. Ins. Co. v. Schettler*, 768 P.2d 950, 959 (Utah Ct. App. 1989); *Gilbert v. Ince*, 1999 UT 65, ¶ 18, 981 P.2d 841 (explaining that "malicious prosecution applies to the circumstance when a person with improper motive falsely accuses another individual of a crime"). Utah courts look to the Restatement (Second) of Torts in analyzing claims of malicious prosecution. *See*, *e.g.*, *Hodges v. Gibson Prods. Co.*, 811 P.2d 151; *Gilbert*, 1999 UT 65 at ¶ 18; *Neff v. Neff*, 2011 UT 6, ¶ 52, 247 P.3d 380. With respect to the first element the Restatement (Second) of Torts states that

> When a private person gives to a prosecuting officer information that he believes to be true, and the officer in the exercise of his uncontrolled discretion initiates criminal proceedings based upon that information, the informer is not liable . . . even though the information proves to be false and his belief was one that a reasonable man would not entertain.  The exercise of the officer's discretion makes the initiation of the prosecution on his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.

Restatement (Second) of Torts, § 653 (1977); *cf Peterson v. Adams*, No. 216CV00775RJSPMW, 2018 WL 4627089, at *13 (D. Utah Sept. 7, 2018), report and recommendation adopted, No. 216CV00775RJSPMW, 2018 WL 4621760 (D. Utah Sept. 26, 2018) (explaining that in a malicious prosecution case "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor").

Dunn alleges that Captain Banish's report to the FBI regarding Dunn's statements "set in motion Dunn's wrongful prosecution." (Compl. ¶ 126(b).) Dunn also alleges that Captain Banish made a series of "knowingly false statements to investigators and prosecutors." (*Id*. ¶ 126(c).)[9]

In addition, Dunn claims that because Cink and Miller knew of Captain Banish's FBI call, "their questions [in a Delta interview] were a deliberate effort to elicit incriminating statements from Dunn," they "helped initiate and continue the criminal proceeding," and "on information and belief," they "encouraged Banish to call the FBI." (*Id*. ¶ 126(c).) Finally, Dunn alleges that Cink assisted the government's prosecution as both a fact and an expert witness . . . and was prepared to give false testimony as to Delta's policy regarding flight diversion." (*Id*. ¶ 126(g).)

As an initial matter, Dunn's allegations, even if true, do not demonstrate that the prosecutor's discretion was controlled by the Delta Defendants. And the documents referred to and incorporated into Dunn's Complaint make clear that Captain Banish consistently stated that he was not sure whether Dunn was joking when he made the statement at issue (which, again, is not disputed by Dunn), and he explicitly told prosecutors that he intended only to provide the

---

[9] In addition to the arguments in this section dictating the dismissal of Dunn's malicious prosecution claim, that claim also fails because all of Captain Banish's alleged statements are covered by the judicial proceedings privilege as set forth above in Section II(B)(i). Dunn's malicious prosecution claim fails for this additional reason. *See Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 28, 285 P.3d 1157, 1164 (noting that the Utah Supreme Court extended the judicial proceedings privilege "beyond defamation claims to include 'all claims arising from the same statements.'"); *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1200-01 (10th Cir. 2007) ("The interests served by [the protections afforded speech from a defamation claim] would be undermined if the common law recognized a different tort based on the same speech."); *Blatty v. New York Times Co.*, 728 P.2d 1177, 1183-84 (Cal. 1986) ("First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement" because such limitations "do not concern matters peculiar to [defamation] actions but broadly protect free-expression and free-press values.").

facts as he experienced them. He expressly declined to give his opinion as to the appropriate charges (if any) that should be brought against Dunn. (Ex. A at 2157-2222.)

Because Captain Banish's statements to the FBI and federal prosecutors cannot constitute malicious prosecution, Dunn necessarily cannot establish that the remaining Delta Defendants are culpable or responsible for initiating criminal proceedings against Dunn. *See* Restatement (Second) of Torts, § 653 (1977). Or in other words, because Captain Banish did not do anything unlawful by providing truthful statements to law enforcement, any "encouragement" by the remaining Delta Defendants for Captain Banish to participate in these interviews with law enforcement cannot be the basis for the Delta Defendants' liability for malicious prosecution.

Further, the specific allegations against Cink and Miller, even if true, are insufficient to state a claim of malicious prosecution. First, Cink and Miller's interview of Dunn, in the context of reviewing Dunn's continued employment with Delta in light of his threat to kill Captain Banish (which was in violation of Delta policy), bears no relation to the criminal prosecution, even if Dunn did make incriminating statements. Second, Cink's "willingness" to comply with a subpoena from this Court and testify in Dunn's criminal prosecution as a fact witness is not "putting the law in force." And it is certainly not wrongful in any way. And . . . it never happened; Cink never testified as a witness.[10] Thus, it cannot sustain a claim for malicious

---

[10] Captain Cink was also designated by Delta Air Lines to testify as the person most knowledgeable about Delta's policies and procedures relating to Crew Resource Management, the proper role of a Captain and a First Officer, and Delta's policies and training requiring all pilots to always consider viable diversion points in the event an emergency escalates. (*See* Notice of Designation of Expert Witness, Dkt. 51, Case No. 2:23-cr-00375.) Captain Cink is a Director at Delta and the Chief Pilot of the Western Region, overseeing over 3,000 pilots based in Salt Lake City, Los Angeles, and Seattle. In that role, he is intimately familiar with the policies and procedures for which the United States sought testimony from Delta. Thus, Captain Cink's designation as an expert is ordinary and unremarkable given the subject-matter of the requested

prosecution.

      ii.      <u>The Delta Defendants Had Probable Cause to Report Dunn's Possible Crime</u>.

"[P]robable cause 'is not a high bar' and it 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Thomas v. Smith*, No. 2:21-cv-210 DBP, 2023 WL 6194231, \*13 (D. Utah Aug. 16, 2023). And for the purposes of malicious prosecution, a person can rely on the advice of the prosecuting attorney in determining whether probable cause exists. *See*, *e.g.*, *Hodges*, 811 P.2d at 159-60; *Potter v. Utah Driv-Ur-Self System, Inc*., 355 P.2d 714, 718 (Utah 1960) ("[I]f one could not sign such a complaint upon the advice of the prosecuting attorney and in reliance on the work of properly constituted officers in the performance of their duties, the result would be to greatly discourage cooperation in the filing of such complaints, thus impairing the process of justice.").

Captain Banish explicitly stated to law enforcement that he did not know whether Dunn was joking (or not) or if he committed an actionable crime based upon the facts provided. (Ex. A at 2200-2222.) And the Assistant United States Attorney prosecuting the matter acknowledged that the charging decision fit squarely within his discretion, and he ultimately indicted Dunn based on that probable cause. (*See id*.)

      iii.      <u>The Delta Defendants Reported Dunn's Possible Crime in the Interests of Justice</u>.

The "malice element means that Defendants initiated criminal proceedings for a 'primary purpose other than bringing an offender to justice.'" *Agler*, 2006 WL 3647393, \*1 (citing *Amica*

---

testimony. Of note, the Delta Defendants have located no case finding an individual liable for malicious prosecution based solely on their designation as an expert in a particular subject-matter.

*Mut. Ins. Co*., 768 P.2d at 959). The evidence is clear that Captain Banish (and thus the remaining Delta Defendants) made reports in good faith and without regard to Dunn's political beliefs (which Captain Banish agreed with). (Ex. D.) In fact, federal law mandates such reports with the threat of civil penalties. 49 U.S.C. § 44905(a) (An "air carrier . . . or individual employed by an air carrier . . . receiving information (except a communication directed by the United States Government) about a threat to civil aviation ***shall*** provide the information promptly to the Administrator"); *see also* 49 U.S.C. § 46301 (penalizing violations of § 44905).

When Captain Banish made his first report to the FBI, he stated that the "reason for [his] call is . . . just to report the incident." (Ex. B at 5:17-21.) Captain Banish also stated that if "nothing were to happen with [Dunn], [he] wouldn't be surprised, but if there were a serious incident, [he] would also not be surprised." (*Id*. at 5:23-6:1.) Captain Banish was clear that he simply wanted to do his civic duty by reporting it ("see something, say something") because he did not want to be in a position of not reporting it and then Dunn later did something.

Thus, the documents referred to in the Complaint, which are central to Dunn's claims, clearly demonstrate that Captain Banish (and thus the Delta Defendants) had no improper purpose in reporting Dunn's statements to law enforcement.

        iv.        <u>The Criminal Proceedings Did Not Terminate in Dunn's Favor</u>.

Criminal proceedings "have terminated in favor of the accused only when the final disposition of the criminal charges is such as to indicate the innocence of the accused." *Neff v. Neff*, 2011 UT 6, ¶ 52, 247 P.3d 380. Indeed, "[a] termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a

cause of action for malicious prosecution." *Puttuck v. Gendron*, 2008 UT App 362, ¶ 9, 199 P.3d 971 (quoting Restatement (Second) of Torts § 660 (1977)).

In this case, the United States Attorney's office ultimately sought dismissal of the charges against Dunn without prejudice. (Dismissal, Case No. 2:23-cr-00375, Dkt. 160.) Dunn was not acquitted and the dismissal does not indicate Dunn's innocence. (*Id*.) As such, Dunn cannot meet this element as a matter of law.

For these reasons, Dunn has not sufficiently alleged a claim for malicious prosecution against the Delta Defendants, and thus his claim should be dismissed as a matter of law.

## **CONCLUSION**

For the foregoing reasons, the Delta Defendants respectfully request that the Court dismiss Plaintiff's claims against them as they fail to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).

DATED this 28th day of March 2025.

RAY QUINNEY & NEBEKER P.C.

*/s/ Katherine E. Priest*
Rick Thaler
David B. Dibble
Katherine E. Priest

*Attorneys for Defendants Delta Air Lines, Inc., Robert Banish, Kevin Miller, and Brian Cink*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of March 2025, I electronically filed the foregoing

**DEFENDANTS' MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) AND UTAH'S**

**UNIFORM PUBLIC EXPRESSION PROTECTION ACT** using the CM/ECF system of the

District Court of the State of Utah which sent notification of such filing to:

> Tyler Green
> Matt Pociask
> Patrick Strawbridge
> **CONSOVOY MCCARTHY PLLC**
> tyler@consovoymccarthy.com
> matt@consovoymccarthy.com
> patrick@consovoymccarthy.com
>
> *Attorneys for Plaintiff*

/s/ *Marci Meyers*

1698838