# EXHIBIT F

# UNIFORM PUBLIC EXPRESSION PROTECTION ACT

drafted by the

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

and by it

APPROVED AND RECOMMENDED FOR ENACTMENT
IN ALL THE STATES

at its

ANNUAL CONFERENCE
MEETING IN ITS ONE-HUNDRED-AND-TWENTY-NINTH YEAR
JULY 10–15, 2020



*WITH PREFATORY NOTE AND COMMENTS*

Copyright © 2020
By
NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

October 2, 2020

# ABOUT ULC

The **Uniform Law Commission** (ULC), also known as National Conference of Commissioners on Uniform State Laws (NCCUSL), now in its 129th year, provides states with non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law.

ULC members must be lawyers, qualified to practice law. They are practicing lawyers, judges, legislators and legislative staff and law professors, who have been appointed by state governments as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands to research, draft and promote enactment of uniform state laws in areas of state law where uniformity is desirable and practical.

- ULC strengthens the federal system by providing rules and procedures that are consistent from state to state but that also reflect the diverse experience of the states.

- ULC statutes are representative of state experience, because the organization is made up of representatives from each state, appointed by state government.

- ULC keeps state law up-to-date by addressing important and timely legal issues.

- ULC's efforts reduce the need for individuals and businesses to deal with different laws as they move and do business in different states.

- ULC's work facilitates economic development and provides a legal platform for foreign entities to deal with U.S. citizens and businesses.

- Uniform Law Commissioners donate thousands of hours of their time and legal and drafting expertise every year as a public service, and receive no salary or compensation for their work.

- ULC's deliberative and uniquely open drafting process draws on the expertise of commissioners, but also utilizes input from legal experts, and advisors and observers representing the views of other legal organizations or interests that will be subject to the proposed laws.

- ULC is a state-supported organization that represents true value for the states, providing services that most states could not otherwise afford or duplicate.

## UNIFORM PUBLIC EXPRESSION PROTECTION ACT

The Committee appointed by and representing the National Conference of Commissioners on Uniform State Laws in preparing this act consists of the following:

| | |
|---|---|
| LANE SHETTERLY | Oregon, *Chair* |
| JERRY L. BASSETT | Alabama |
| JAMES BOPP JR. | Indiana |
| EFFIE V. BEAN COZART | Tennessee |
| ELENA J. DUARTE | California |
| LEON M. McCORKLE | Ohio |
| WILLIAM J. QUINLAN | Illinois |
| V. LOWRY SNOW | Utah |
| D. JOE WILLIS | Oregon |
| CARL H. LISMAN | Vermont, *President* |
| THOMAS S. HEMMENDINGER | Rhode Island, *Division Chair* |

### OTHER PARTICIPANTS

| | |
|---|---|
| ROBERT T. SHERWIN | Texas, *Reporter* |
| LAURA L. PRATHER | Texas, *American Bar Association Advisor* |
| JAY D. ADKISSON | Nevada, *American Bar Association Section Advisor* |
| JAMES M. CONCANNON | Kansas, *Style Liaison* |
| TIM SCHNABEL | Illinois, *Executive Director* |

Copies of this act may be obtained from:

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS
111 N. Wabash Ave., Suite 1010
Chicago, IL 60602
312/450-6600
www.uniformlaws.org

# UNIFORM PUBLIC EXPRESSION PROTECTION ACT

## TABLE OF CONTENTS

Prefatory Note........................................................................................................................ 1
SECTION 1.  SHORT TITLE ............................................................................................. 5
SECTION 2.  SCOPE .......................................................................................................... 5
SECTION 3.  SPECIAL MOTION FOR EXPEDITED RELIEF ............................... 10
SECTION 4.  STAY ........................................................................................................... 11
SECTION 5.  HEARING.................................................................................................... 14
SECTION 6.  PROOF......................................................................................................... 15
SECTION 7.  [DISMISSAL OF] [STRIKING] CAUSE OF ACTION IN WHOLE OR PART. 16
SECTION 8.  RULING. ...................................................................................................... 20
SECTION 9.  APPEAL. ...................................................................................................... 21
SECTION 10.  COSTS, ATTORNEY'S FEES, AND EXPENSES ........................... 21
SECTION 11.  CONSTRUCTION..................................................................................... 22
SECTION 12.  UNIFORMITY OF APPLICATION AND CONSTRUCTION.......... 23
SECTION 13.  TRANSITIONAL PROVISION ............................................................ 23
[SECTION 14.  SAVINGS CLAUSE]............................................................................. 23
[SECTION 15.  SEVERABILITY]. .................................................................................. 23
[SECTION 16.  REPEALS; CONFORMING AMENDMENTS]. ............................... 23
SECTION 17.  EFFECTIVE DATE.................................................................................. 24

# UNIFORM PUBLIC EXPRESSION PROTECTION ACT

## Prefatory Note

***Special Thanks.*** The Committee wishes to thank Thomas R. Burke, Stanley W. Lamport, Ben Sheffner, and Ashley H. Verdon, all of whom served as Observers during the drafting process, for their steady and valued input and expertise.

***Introduction.*** In the late 1980s, commentators began observing that the civil litigation system was increasingly being used in an illegitimate way: not to seek redress or relief for harm or to vindicate one's legal rights, but rather to silence or intimidate citizens by subjecting them to costly and lengthy litigation. These kinds of abusive lawsuits are particularly troublesome when defendants find themselves targeted for exercising their constitutional rights to publish and speak freely, petition the government, and associate with others. Commentators dubbed these kinds of civil actions "Strategic Lawsuits Against Public Participation," or SLAPPs.

SLAPPs defy simple definition. They can be brought by and against individuals, corporate entities, or government officials across all points of the political or social spectrum. They can address a wide variety of issues—from zoning, to the environment, to politics, to education. They are often cloaked as otherwise standard claims of defamation, civil conspiracy, tortious interference, nuisance, and invasion of privacy, just to name a few. But for all the ways in which SLAPPs may clothe themselves, their unifying features make them a dangerous force: Their purpose is to ensnare their targets in costly litigation that chills society from engaging in constitutionally protected activity.

***Anti-SLAPP Laws in the United States.*** To limit the detrimental effects SLAPPs can have, 32 states, as well as the District of Columbia and the Territory of Guam, have enacted laws to both assist defendants in seeking dismissal and to deter vexatious litigants from bringing such suits in the first place. An Anti-SLAPP law, at its core, is one by which a legislature imposes external change upon judicial procedure, in implicit recognition that the judiciary has not itself modified its own procedures to deal with this specific brand of abusive litigation. Although procedural in operation, these laws protect *substantive rights*, and therefore have *substantive effects*. So, it should not be surprising that each of the 34 legislative enactments have been performed statutorily—*none* are achieved through civil-procedure rules. The states that have passed anti-SLAPP legislation, in one form or another, are:

Arizona (2006) (Ariz. Rev. Stat. Ann. § 12-752) (2006)
Arkansas (2005) (Ark. Code Ann. § 16-63-501 through § 16-63-508) (2005)
California (1992) (Cal. Civ. Proc. Code § 425.16 through § 425.18)
Colorado (2019) (Col. Rev. Stat. Ann. § 13-20-1101)
Connecticut (2018) (Conn. Gen. Stat. Ann. § 52-196a)
Delaware (1992) (Del. Code Ann. tit. 10, § 8136, through § 8138)
District of Columbia (2012) (D.C. Code § 16-5501 through § 16-5505)
Florida (2004, 2000) (Fla. Stat. Ann. §§ 720.304, 768.295)
Georgia (1996) (Ga. Code. Ann. § 9-11-11.1)
Guam (1998) (Guam Code Ann. tit. 7, § 17101 through § 17109)

Hawaii (2002) (Haw. Rev. Stat. § 634F-1 through § 634F-4)
Illinois (2007) (735 Ill. Comp. Stat. 110/15 through 110/99)
Indiana (1998) (Ind. Code § 34-7-7-1 through § 34-7-7-10)
Kansas (2016) (Kan. Stat. Ann § 60-5320)
Louisiana (1999) (La. Code Civ. Proc. Ann. art. 971)
Maine (1995) (Me. Rev. Stat. Ann. tit. 14, § 556)
Maryland (2004) (Md. Code Ann., Cts. & Jud. Proc. § 5-807)
Massachusetts (1994) (Mass. Gen. Laws ch. 231, §59H)
Minnesota (1994) (Minn. Stat. § 554.01 through § 554.06) (Held unconstitutional by
    *Leiendecker v. Asian Women United of Minnesota*, 895 N.W.2d 623, 635-37 (Minn.
    2017))
Missouri (2004) (Mo. Rev. Stat. § 537.528)
Nebraska (1994) (Neb. Rev. Stat. § 25-21,243 through § 25-21,246)
Nevada (1997) (Nev. Rev. Stat. § 41.635 through 41.670)
New Mexico (2001) (N.M. Stat. § 38-2-9.1 through § 38-2-9.2)
New York (1992) (NY. Civ. Rights Law § 70-a and § 76-a)
Oklahoma (2014) (Okla. Stat. tit. 12, § 1430 through § 1440)
Oregon (2001) (Or. Rev. Stat. § 31.150 through § 31.155)
Pennsylvania (2000) (27 Pa. Consol. Stat. § 8301 through § 8305, and § 7707)
Rhode Island (1993) (R.I. Gen. Laws § 9-33-1 through § 9-33-4)
Tennessee (2019, 1997) (Tenn. Code. Ann. § 20-17-101 through § 20-17-110; § 4-21-
    1001 through § 4-21-1004)
Texas (2011) (Tex. Civ. Prac. & Rem. Code § 27.001 through § 27.011)
Utah (2008) (Utah Code § 78B-6-1401 through § 78B-6-1405)
Vermont (2005) (Vt. Stat. Ann. tit. 12 § 1041)
Virginia (2007) (Va. Code Ann. § 8.01-223.2)
Washington (2010, 1989) (Wash. Rev. Code § 4.24.500 through § 4.24.525) (Held
    unconstitutional by *Davis v. Cox*, 351 P.3d 862, 875 (Wash. 2015))

Many early anti-SLAPP statutes were narrowly drawn by limiting their use to particular types of parties or cases—for example, to lawsuits *brought by* public applicants or permittees, or to lawsuits *brought against* defendants speaking in a particular forum or on a particular topic. More recently, however, legislatures have recognized that narrow anti-SLAPP laws are ineffectual in curbing the many forms of abusive litigation that SLAPPs can take. To that end, most modern statutory enactments have been broad with respect to the parties that may use the acts and the kinds of cases to which the acts apply.

The recent trend further evidences a shift toward statutes that achieve their goals by generally employing at least **five mechanisms:**

1. Creating specific vehicles for filing motions to dismiss or strike early in the litigation process;
2. Requiring the expedited hearing of these motions, coupled with a stay or limitation of discovery until after they're heard;
3. Requiring the plaintiff to demonstrate the case has some degree of merit;
4. Imposing cost-shifting sanctions that award attorney's fees and other costs when the

plaintiff is unable to carry its burden; and

5. Allowing for an interlocutory appeal of a decision to deny the defendant's motion.

***The Need for a Uniform Anti-SLAPP Act.*** Although there is certainly a movement toward broad statutes that utilize the five tools described above, the precise ways in which different states have constructed their laws are far from cohesive. This degree of variance from state to state—and an absence of protection in 18 states—leads to confusion and disorder among plaintiffs, defendants, and courts. It also contributes to what can be called "litigation tourism"; that is, a type of forum shopping by which a plaintiff who has choices among the states in which to bring a lawsuit will do so in a state that lacks strong and clear anti-SLAPP protections. Several recent high-profile examples of this type of forum shopping have made the need for uniformity all the more evident.

The Uniform Public Expression Protection Act seeks to harmonize these varying approaches by enunciating a clear process through which SLAPPs can be challenged and their merits fairly evaluated in an expedited manner. In doing so, the Act actually serves two purposes: protecting individuals' rights to petition and speak freely on issues of public interest while, at the same time, protecting the rights of people and entities to file meritorious lawsuits for real injuries.

***The Uniform Public Expression Protection Act, Generally.*** The Uniform Public Expression Protection Act follows the recent trend of state legislatures to enact broad statutory protections for its citizens. It does so by utilizing all five of the tools mentioned above in a motion practice that carefully and clearly identifies particular burdens for each party to meet at particular phases in the motion's procedure.

The general flow of a motion under the Act employs a three-phase analysis seen in many states' statutes. Upon the filing of a motion, all proceedings—including discovery—between the moving party and responding party are stayed, subject to a few specific exceptions. In the **first phase**, the court effectively decides whether the Act applies. It does so by first determining if the responding party's (typically the plaintiff's) cause of action implicates the moving party's (typically the defendant's) right to free speech, petition, or association. The burden is on the moving party to make the initial showing that the Act applies. If the court holds that the moving party *has not* carried that burden, then the motion is denied, the stay of proceedings is lifted, and the parties proceed to litigate the merits of the case (subject to the ability of the moving party to interlocutorily appeal the motion's denial). If the court determines that the moving party *has* carried its burden, then the responding party can show its cause of action fits within one of the three exceptions to the Act. If it carries that burden—for example, by showing that its cause of action is against an agent of a governmental unit acting or purporting to act in an official capacity—then the Act does not apply, and the motion is denied. If it fails to carry that burden, then the court proceeds to the second step of the analysis.

In the **second phase**, the court determines if the responding party has a viable cause of action from a prima-facie perspective. In this phase, the burden is on the responding party to establish a prima-facie case for each essential element of the cause of action challenged by the motion. If the court holds that the responding party *has not* carried its burden to establish a

prima-facie case, then the motion is granted, and the responding party's cause of action is terminated with prejudice to refiling. The moving party is entitled to its costs, attorney's fees, and expenses. If the court holds that the responding party *has* carried its burden, then—and only then—the court proceeds to the third step of the analysis.

In the **third phase**, the court determines if the responding party has a *legally* viable cause of action. In this phase, the burden shifts *back* to the moving party to show either that the responding party failed to state a cause of action upon which relief can be granted (for example, a claim that is barred by res judicata, or preempted by some other law), or that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law (for example, if the cause of action, while perhaps factually viable, is time-barred by limitations). If the moving party makes such a showing, the motion is granted; if it fails to make such a showing, the motion is denied.



**Motion Analysis Path § 7(a)**

Analysis path after a pleading is filed that asserts a cause of action with the scope of § 2, and the party against whom the cause of action is asserted files a motion for expedited relief per § 3.

**PHASE ONE - Applicability**
Movant shows that the cause of action facially falls within the scope of the Act, § 7(a)(1),
- and -
Respondent may rebut that the action does not legally fall within the scope of the Act, § 7(a)(2).

**Court finds action not within scope**
Movant loses motion and may appeal immediately as a matter of right, § 9.

**Court finds action within scope**

**Court finds that Respondent failed to prove prima facie case**
Respondent loses motion and cause of action is stricken/dismissed with prejudice, § 7(a). Respondent may appeal at the conclusion of case.

**PHASE TWO - Prima Facie Viability**
Respondent proves that the cause of action does state a prima facie case as to each essential element of claim, § 7(a)(3)(A).

**Court finds prima facie case stated by Respondent**

**PHASE THREE - Legal Viability**
Movant shows that no cause of action upon which relief may be granted has been stated, § 7(a)(3)(B)(i),
- or -
Movant shows that there is no genuine issue of material fact and Movant is entitled to judgment as a matter of law, § 7(a)(3)(B)(ii).

**Court finds Respondent's case to be viable as a matter of law**
Movant loses motion and may appeal immediately as a matter of right, § 9.

**Court finds Respondent's case to not be viable as a matter of law**

Movant wins motion and cause of action is stricken with prejudice, § 7(a). Respondent may appeal at the conclusion of case.

## UNIFORM PUBLIC EXPRESSION PROTECTION ACT

**SECTION 1.  SHORT TITLE.**  This [act] may be cited as the Uniform Public

Expression Protection Act.

### Comment

Although "SLAPP"—an acronym for "Strategic Lawsuit Against Public Participation"—does not appear in the Act's title, the Uniform Public Expression Protection Act should be considered an anti-SLAPP act.  Although "[t]he paradigm SLAPP is a suit filed by a large developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans," SLAPPs "are by no means limited to environmental issues, nor are the defendants necessarily local organizations with limited resources."  *Hupp v Freedom Commc'ns*, 163 Cal. Rptr. 3d 919, 922 (Cal. Ct. App. 2013).  "[W]hile SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so."  *Id.*

**SECTION 2.  SCOPE.**

(a) In this section:

(1) "Goods or services" does not include the creation, dissemination, exhibition,

or advertisement or similar promotion of a dramatic, literary, musical, political, journalistic, or

artistic work.

(2) "Governmental unit" means a public corporation or government or

governmental subdivision, agency, or instrumentality.

(3) "Person" means an individual, estate, trust, partnership, business or nonprofit

entity, governmental unit, or other legal entity.

(b) Except as otherwise provided in subsection (c), this [act] applies to a [cause of action]

asserted in a civil action against a person based on the person's:

(1) communication in a legislative, executive, judicial, administrative, or other

governmental proceeding;

(2) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or

(3) exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or [cite to the state's constitution], on a matter of public concern.

(c) This [act] does not apply to a [cause of action] asserted:

(1) against a governmental unit or an employee or agent of a governmental unit acting or purporting to act in an official capacity;

(2) by a governmental unit or an employee or agent of a governmental unit acting in an official capacity to enforce a law to protect against an imminent threat to public health or safety; or

(3) against a person primarily engaged in the business of selling or leasing goods or services if the [cause of action] arises out of a communication related to the person's sale or lease of the goods or services.

***Legislative Note:*** *If a state does not use the term "cause of action", the state should use its comparable term, such as "claim for relief" in subsections (b) and (c). The state also should substitute its comparable term for the term "[cause of action]" in Sections 3, 4(f), 7, 13, and 14.*

### Comments

1.      Most courts explain the resolution of anti-SLAPP motions in terms of either a three- or two-pronged procedure. *E.g.*, *Younkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018) ("Reviewing a[n anti-SLAPP] motion to dismiss requires a three-step analysis."); *Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 713 (Cal. 2019) ("A court evaluates an anti-SLAPP motion in two steps."). Section 2 of the Act constitutes the **first step** of that procedure, where the moving party (typically the defendant) must show that the responding party's (typically the plaintiff's) cause of action arises from the movant's exercise of First Amendment rights on a matter of public concern. This step focuses on the *movant's activity*, and whether the movant can show that it has been sued for that activity. *See, e.g.*, *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002) ("The anti-SLAPP statute's definitional focus is not [on] the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability and whether that activity constitutes protected speech or petitioning." (emphasis original)). If the movant cannot

satisfy the first step—in other words, cannot show that the cause of action is linked to First Amendment activity on a matter of public concern—then the court will deny the motion without ever proceeding to the second or third step. Thomas R. Burke, Anti-SLAPP Litigation § 1.2 (2019). Further discussion of how a court adjudicates the first step, including the parties' burdens and the materials a court should review, appears in Comments 2 and 3 to Section 7.

2.      Although the Act operates in a procedural manner—specifically, by altering the typical procedure parties follow at the outset of litigation—the *rights* the act protects are most certainly *substantive* in nature. *See U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 972-973 (9th Cir. 1999) (applying California's anti-SLAPP law to diversity actions in federal court because the statute was "crafted to serve an interest not directly addressed by the Federal Rules: the protection of 'the constitutional rights of freedom of speech and petition for redress of grievances.'"). Otherwise stated, the Act's procedural features are designed to prevent substantive consequences: the impairment of First Amendment rights and the time and expense of defending against litigation that has no demonstrable merit. *Williams v. Cordillera Comms., Inc.*, No. 2:13–CV–124, 2014 WL 2611746, at * 1 (S.D. Tex. June 11, 2014). As stated by one California court, "[t]he point of the anti-SLAPP statute is that you have a right not to be dragged through the courts because you exercised your constitutional rights." *People ex rel. Lockyer v. Brar*, 115 Cal. App. 4th 1315, 1317 (4th Dist. 2004).

3.      The statute is only applicable to civil actions. It has no applicability in criminal proceedings.

4.      The term "civil action" should be construed consistently with Fed. R. Civ. P. 1.

5.      The term "cause of action" refers to a group of operative facts that give rise to one or more bases for recovery in a civil action. The term contemplates that in one civil action, a party seeking relief may assert multiple causes of action that invoke different facts and theories for relief. In some jurisdictions, other terms of art, such as "claim for relief," "ground of action," "right of action," or "case theory," might be more appropriate than "cause of action." *See, e.g., Baral v. Schnitt*, 376 P.3d 604, 616 (Cal. 2016) (holding that when the California Legislature used the term "cause of action" in its anti-SLAPP statute, "it had in mind *allegations* of protected activity that are asserted as grounds for relief" (emphasis original)). Regardless of the term used by a state, the Act can be utilized to challenge part or all of a single cause of action, or multiple causes of action in the same case. *See id.* at 615 ("A single cause of action . . . may include more than one instance of alleged wrongdoing."). Otherwise stated, a single civil action can contain both a cause of action subject to the Act and one not subject to the Act.

6.      Sections 2(b)(1) and (2) apply to a cause of action brought against a person based on the person's communication. "Communication" should be construed broadly—consistent with holdings of the Supreme Court of the United States—to include any expressive conduct that likewise implicates the First Amendment. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[W]e have long recognized that [First Amendment] protection does not end at the spoken or written word."); *Spence v. Washington*, 418 U.S. 405, 409-11 (1974) (holding that conduct constitutes "communication" when it is accompanied by an intent to convey a particularized message and, given the surrounding circumstances, the likelihood is great that the message will

be understood by those who view it); *Rumsfeld v. Forum for Acad. and Institutional Rights*, 547 U.S. 47, 65-66 (2006); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969). Conduct is not specifically mentioned in the Act so as to avoid parties from attempting to use it to shield themselves from liability for *nonexpressive* conduct that nevertheless tangentially relates to a matter of public concern. *See United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). But the Act *is* intended to protect *expressive* conduct. For example, a person's work on behalf of a political campaign might include constitutionally protected expressive conduct, such as putting up campaign signs or organizing a rally. The Act would protect that conduct. But a person who damages another candidate's campaign signs or physically threatens attendees at an opposing rally would not be engaging in expressive conduct, and therefore should not be able to utilize the Act, even though the conduct tangentially relates to matters of public concern.

7.      Sections 2(b)(1)-(3) identify three different instances in which the Act may be utilized. Section 2(b)(1) protects communication that occurs before any legislative, executive, judicial, administrative, or other governmental proceeding—effectively, any speech or expressive conduct that would implicate one's right to petition the government. Section 2(b)(2) operates similarly, but extends to speech or expressive conduct *about* those matters being considered in legislative, executive, judicial, administrative, or other governmental proceedings—the speech or conduct need not take place *before* the governmental body. Section 2(b)(3) operates differently than (1) and (2) and provides the broadest degree of protection; it applies to *any* exercise of the right of free speech or press, free association, or assembly or petition, so long as that exercise is on a matter of public concern.

8.      The terms "freedom of speech or of the press," "the right to assemble or petition," and "the right of association" should all be construed consistently with caselaw of the Supreme Court of the United States and the state's highest court.

9.      The term "matter of public concern" should be construed consistently with caselaw of the Supreme Court of the United States and the state's highest court. *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (holding that "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public'" (citations omitted)); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011) ("The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."). "The [matter-of-public-concern] inquiry turns on the 'content, form, and context' of the speech." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). The term should also be construed consistently with terms like "public issue" and "matter of public interest" seen in some state statutes. *See, e.g.*, CAL. CIV. PROC. CODE § 425.16 (employing the terms "public issue" and "issue of public interest"); *FilmOn.com Inc. v. DoubleVerify Inc.*, 439 P.3d 1156, 1164-65 (Cal. 2019).

        The California Supreme Court breaks "matter of public concern" (or in its statute, "public issue" or "issue of public interest") into a two-part analysis. *FilmOn.com*, 439 P.3d at 1165.

"First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." *Id.* (citation omitted). The court observed that the first step is typically not difficult for the movant: "[V]irtually always, defendants succeed in drawing a line—however tenuous—connecting their speech to an abstract issue of public interest." *Id.* But the second step is where many movants fail. The inquiry "demands 'some degree of closeness' between the challenged statements and the asserted public interest." *Id.* (citation omitted). As other California courts have noted, "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 506 (Cal. Ct. App. 2004); *see also Dyer v. Childress*, 55 Cal. Rptr. 3d 544, 548 (2007) ("The fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not enough." (citation omitted)).

The California Supreme Court explains that what it means to "contribute to the public debate" "will perhaps differ based on the state of public discourse at a given time, and the topic of contention. But ultimately, our inquiry does not turn on a normative evaluation of the substance of the speech. We are not concerned with the social utility of the speech at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether a defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." *FilmOn, Inc.*, 439 P.3d at 1166.

Further discussion of how a court adjudicates whether a cause of action is based on the moving party's exercise of First Amendment rights on a matter of public concern, including the movant's burden and the materials a court should review, appears in Comment 2 to Section 7.

10. Section 2(c) provides a list of exemptions, or situations to which the Act does not apply. It is the burden of the responding party to establish the applicability of one or more exemptions. Thus, even if a movant can show the Act applies under Section 2(b), the Act may nevertheless *not* apply if the non-movant can show the cause of action is exempt. Further discussion of how a court adjudicates whether a cause of action is exempt, including the responding party's burden and the materials a court should review, appears in Comment 3 to Section 7.

11. The term "governmental unit or an employee or agent of a governmental unit acting in an official capacity" includes any private people or entities working as government contractors, to the extent the cause of action pertains to that government contract.

12. The term "dramatic, literary, musical, political, journalistic, or artistic work" used in Section (a)(3) should be construed broadly to include newspapers, magazines, books, plays, motion pictures, television programs, video games, or Internet websites or other electronic mediums.

13. Section 2(c)(3) carves out from the scope of the Act "communication[s] related to [a] person's sale or lease of [ ] goods or services" when that person is primarily engaged in the selling, leasing, or licensing of those goods or services. In other words, "commercial speech" is

exempted from the protections of the Act. By way of illustration, if a mattress store is sued for false statements made in its advertising of mattresses—whether by an aggrieved consumer or a competitor—the mattress store would not be able to avail itself of the Act. But if the same mattress store were sued for tortious interference for organizing a petition campaign to oppose the building of a new school, its activity would not be related to the sale or lease of goods or services, and it could use the Act for protection of its First Amendment conduct.

But the "commercial-speech exemption" does not apply to the creation, dissemination, exhibition, or advertisement of a dramatic, literary, musical, political, journalistic, or artistic work. This is consistent with the holdings of most courts that the contents of works protected by the First Amendment are not considered "goods or services," even if sold for profit. *See, e.g.*, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) (ideas and expressions in a book are not a product); *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 239 (Tex. 1993) ("We conclude that the ideas, thoughts, words, and information conveyed by the magazine . . . are not products."). This ensures that claims targeting those in the business of making and selling works protected by the First Amendment are not denied the ability to invoke the Act. *See Dyer v. Childress*, 147 Cal. App. 4th 1273, 1283 (2007) (expressive works exception to the commercial speech exemption was "intended to 'exempt the news media and other media defendants (such as the motion picture industry) from the [commercial-speech exemption] when the underlying act relates to news gathering and reporting to the public with respect to the news media or to activities involved in the creation or dissemination of any works of a motion picture or television studio.'" (citations omitted)).

**SECTION 3. SPECIAL MOTION FOR EXPEDITED RELIEF.** Not later than [60] days after a party is served with a [complaint] [petition], crossclaim, counterclaim, third-party claim, or other pleading that asserts a [cause of action] to which this [act] applies, or at a later time on a showing of good cause, the party may file a special motion for expedited relief to [dismiss] [strike] the [cause of action] or part of the [cause of action].

***Legislative Note:*** *A state should use the term "complaint" or "petition", or both, to describe any procedural means by which a cause of action may be asserted.*

*A state should title its motion one to "dismiss" or "strike" in accordance with its procedures and customs. The state also should substitute its term for the term "[dismiss] [strike]" in Section 7(a).*

*A state may need to amend its statutes or rules of civil procedure to prevent a motion under this section from being considered a first pleading or motion that waives a defense or precludes the filing of another pleading or motion.*

**Comments**

1.      Unlike a defense under Fed. R. Civ. P. 12(b), the motion need not be filed prior to other pleadings in the case, and a party should not be estopped from filing a motion by taking any other actions in the case.

2.      The Act should apply not just to initial claims brought by a plaintiff against a defendant, but to *any* claim brought by *any* party who seeks to punish or intimidate another party for the exercise of its constitutional rights.  In this connection, initial defendants frequently use their ability to bring counterclaims and crossclaims for abusive purposes, and the Act should be available to seek dismissal of such claims.

3.      The terms "complaint" and "petition" are intended to include any amended pleadings that assert a cause of action for the first time in a case.

4.      "Crossclaim" means a cause of action asserted between co-plaintiffs or co-defendants in the same civil action.

5.      "Counterclaim" means a cause of action asserted by a party against an opposing party after an original claim has been made by that opposing party.  The term should be construed synonymously with terms like "counteraction," "countersuit," and "cross-demand."

6.      "Third-party" claim should be construed in accordance with Fed. R. Civ. P. 14.

7.      "Good cause" means a reason factually or legally sufficient to appropriately explain why the motion was not brought within the prescribed deadline. This section should not be construed to require a party to seek leave of court prior to filing a motion later than the prescribed deadline. Instead, a court should make any good-cause determination as part of its ruling on the motion under Section 8.

8.      Some states may choose to title their special motion one to "dismiss," while others may title it one to "strike."  The choice of title is not substantive in nature and does not affect uniformity or construction of the statute.

### SECTION 4.  STAY.

(a) Except as otherwise provided in subsections (d) through (g), on the filing of a motion

under Section 3:

(1) all other proceedings between the moving party and responding party,

including discovery and a pending hearing or motion, are stayed; and

(2) on motion by the moving party, the court may stay a hearing or motion

involving another party, or discovery by another party, if the hearing or ruling on the motion would adjudicate, or the discovery would relate to, an issue material to the motion under Section 3.

(b) A stay under subsection (a) remains in effect until entry of an order ruling on the motion under Section 3 and expiration of the time under Section 9 for the moving party to appeal the order.

(c) Except as otherwise provided in subsections (e), (f), and (g), if a party appeals from an order ruling on a motion under Section 3, all proceedings between all parties in the action are stayed. The stay remains in effect until the conclusion of the appeal.

(d) During a stay under subsection (a), the court may allow limited discovery if a party shows that specific information is necessary to establish whether a party has satisfied or failed to satisfy a burden under Section 7(a) and the information is not reasonably available unless discovery is allowed.

(e) A motion under Section 10 for costs, attorney's fees, and expenses is not subject to a stay under this section.

(f) A stay under this section does not affect a party's ability voluntarily to [dismiss] [nonsuit] a [cause of action] or part of a [cause of action] or move to [sever] a [cause of action].

(g) During a stay under this section, the court for good cause may hear and rule on:

(1) a motion unrelated to the motion under Section 3; and

(2) a motion seeking a special or preliminary injunction to protect against an imminent threat to public health or safety.

***Legislative Note:*** *In subsection (f), a state should use the term "dismiss" or "nonsuit" in accordance with its procedures and customs. The state also should substitute its term for the term "[dismiss] [nonsuit]" in Section 7(b) and (c).*

*If a state does not use the term "sever" to describe a motion to sever, the state should use its comparable term in subsection (f).*

### Comments

1.      Section 4 furthers the purpose of the Act by protecting a moving party from the burdens of litigation—which include not only discovery, but responding to motions and other potentially abusive tactics—until the court adjudicates the motion and the moving party's appellate rights with respect to the motion are exhausted.

2.      Section 4(a)(1) provides that the stay only applies to proceedings between the parties to the motion, but Section 4(a)(2) allows the moving party to seek a stay of proceedings and discovery between *other* parties if there are legal or factual issues at play in those proceedings that are material to the party's motion.  Otherwise stated, if a defendant moves to dismiss a plaintiff's cause of action, that motion should not stay proceedings or discovery between the plaintiff and *other* defendants—or between other defendants themselves—unless those proceedings involve legal or factual issues that are material to the motion, or the discovery is relevant to the motion.

        By way of illustration, a candidate for political office sues two defendants—his opponent, for defamation over comments made about the plaintiff during the campaign, and his opponent's campaign manager, for hacking into the plaintiff's campaign's computer files and erasing valuable donor lists and other data.  Only the plaintiff's opponent moves to dismiss under the Act; the campaign manager does not.  In that case, the plaintiff could still proceed with discovery and dispositive motions against the campaign manager, because the claim concerning the hacking is entirely unrelated to the defamation claim.  The moving defendant has no interest that would be affected by the hacking claim.  But under slightly altered facts, a different outcome might exist: The plaintiff alleges that (1) the opposing campaign manager violated the plaintiff's privacy rights by stealing sensitive personal information in the hacking incident; and (2) the opposing candidate violated the plaintiff's privacy rights by disclosing that sensitive personal information in a speech.  Again, the opposing candidate moves to dismiss under the Act; the campaign manager does not.  In that case, the causes of action are so interrelated that the moving defendant would not be able to protect his interests without participating in the case against his co-defendant—something he would not have to do if he prevails on the motion.  In such an example, the court should grant a request to stay the proceedings as between the plaintiff and non-moving defendant, because the moving defendant would have no way of protecting his interests without participating in the case.

3.      Section 4(c) provides that *all* proceedings between all parties in the case are stayed if a party appeals an order under the Act.  This subsection protects a moving party from having to battle related claims—some of which might be subject to a motion under the Act and some which are not—at the same time in two different courts.  For example, if two plaintiffs file causes of action against a single defendant, and the defendant only moves to dismiss against one plaintiff but not the other, the defendant should be able to appeal a denial of that motion without also having to simultaneously defend related causes of action (albeit ones not subject to the Act) in the trial court brought by the other plaintiff.

By way of illustration, multiple plaintiffs—all contestants on a reality TV show contest—sue one defendant—the TV producer—in a single case for their negative treatment on the show. Each plaintiff's claim is distinct and centers on separate statements. The defendant files a motion to dismiss under the Act against only one plaintiff. The motion is denied; the defendant appeals under Section 9. At that point, *all* the proceedings are stayed, because the defendant should not be required to try claims in the trial court while appealing other claims from the same case in the appellate court.

To the extent any party not subject to the motion desires to move forward in the trial court on what it believes are unrelated causes of action while the appeal of the motion's order is pending, it retains the right under Section 4(f) to request a severance of those causes of action.

4.     Section 4(d) provides the court with discretion to permit a party to conduct specified, limited discovery aimed at the sole purpose of collecting enough evidence to meet its burden or burdens under Section 7(a) of the Act. This provision recognizes that a party may not have the evidence it needs—for example, evidence of another individual's state of mind in a defamation action—prior to filing or responding to a motion. The provision allows the party to attempt to obtain that evidence without opening the case up to full-scale discovery and incurring those burdens and costs.

5.     Section 4(g) serves the ultimate purpose of the Act: to allow a party to avoid the expense and burden of frivolous litigation until the court can determine that the claims are not frivolous. In that connection, a court should be free to hear any motion that does not affect the moving party's right to be free from an abusive cause of action, including a motion to conduct discovery on causes of action unrelated to the cause of action being challenged under the Act, and motions for preliminary injunctive relief seeking to protect against an imminent threat to public health or safety.

**SECTION 5.  HEARING.**

(a) The court shall hear a motion under Section 3 not later than [60] days after filing of the motion, unless the court orders a later hearing:

(1) to allow discovery under Section 4(d); or

(2) for other good cause.

(b) If the court orders a later hearing under subsection (a)(1), the court shall hear the motion under Section 3 not later than [60] days after the court order allowing the discovery, unless the court orders a later hearing under subsection (a)(2).

**Comments**

1.      Section 5 should not be construed to prevent the parties from agreeing to a later hearing date and presenting that agreement to the court with a request to find "other good cause" for a later hearing.  Nevertheless, the court, and not the parties, is responsible for controlling the pace of litigation, and the court should affirmatively find that good cause does exist independent of a mere agreement by the parties to a later hearing date.

2.       The question of whether the Act requires a live hearing or whether a court may consider the motion on written submission should be governed by the local customs of the jurisdiction.

3.      State law and local customs of the jurisdiction should dictate the consequences for a court failing to comply with the timelines set forth in this section.

**SECTION 6.  PROOF.**  In ruling on a motion under Section 3, the court shall consider the pleadings, the motion, any reply or response to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under [cite to the state's statute or rule governing summary judgment].

**Comments**

1.      The Act establishes a procedure that shares many attributes with summary judgment.  *See Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1157 (Cal. 2019) (describing the California statute as a "summary-judgment-like procedure"); *Gundel v. AV Homes, Inc.*, 264 So. 3d 304, 312-13 (Fla. Dist. Ct. App. 2019) (equating a motion under Florida's law to one for summary judgment).  So, consistent with summary-judgment practice, parties should submit admissible, competent evidence—such as affidavits, deposition testimony, or tangible evidence—for the court to consider.  *See Sweetwater Union High Sch. Dist.*, 434 P.3d at 1157 ("There are important differences between [anti-SLAPP motions and motions for summary judgment].  Chief among them is that an anti-SLAPP motion is filed much earlier and before discovery.  However, to the extent both schemes are designed to determine whether a suit should be allowed to move forward, both schemes should require a showing based on evidence potentially admissible at trial presented in the proper form.").  A court should use the parties' pleadings to frame the issues in the case, but a party should not be able to rely on its *own* pleadings as substantive evidence.  *See id.*; *Church of Scientology v. Wollersheim*, 49 Cal. Rptr. 2d 620, 636, 637 (Cal. Ct. App. 1996), disapproved of on another point in *Equilon Enters. v. Consumer Cause, Inc.*, 124 Cal. Rptr. 2d 507, 519 n.5 (Cal. Ct. App. 2002).  A party may rely on an *opposing party's* pleadings as substantive evidence, consistent with the general rule that an opposing party's pleadings constitute admissible admissions.  *See Faiella v. Fed. Nat'l Mortg. Ass'n*, 928 F.3d 141, 146 (1st Cir. 2019) ("A party ordinarily is bound by his representations to a court"); *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984) ("[S]tipulations and admissions in the pleadings are generally binding on the parties and the Court.").

2.        The question of whether the Act requires a live hearing or whether a court may consider the motion on written submission should be governed by the local customs of the jurisdiction.

**SECTION 7.  [DISMISSAL OF] [STRIKING] CAUSE OF ACTION IN WHOLE OR PART.**

(a) In ruling on a motion under Section 3, the court shall [dismiss] [strike] with prejudice a [cause of action], or part of a [cause of action], if:

(1) the moving party establishes under Section 2(b) that this [act] applies;

(2) the responding party fails to establish under Section 2(c) that this [act] does not apply; and

(3) either:

(A) the responding party fails to establish a prima facie case as to each essential element of the [cause of action]; or

(B) the moving party establishes that:

(i) the responding party failed to state a [cause of action] upon which relief can be granted; or

(ii) there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the [cause of action] or part of the [cause of action].

(b) A voluntary [dismissal] [nonsuit] without prejudice of a responding party's [cause of action], or part of a [cause of action], that is the subject of a motion under Section 3 does not affect a moving party's right to obtain a ruling on the motion and seek costs, attorney's fees, and expenses under Section 10.

(c) A voluntary [dismissal] [nonsuit] with prejudice of a responding party's [cause of action], or part of a [cause of action], that is the subject of a motion under Section 3 establishes

for the purpose of Section 10 that the moving party prevailed on the motion.

## Comments

1.      Section 7(a) recognizes that a court can strike or dismiss a part of a cause of action—for example, certain operative facts or theories of liability—and deny the motion as to other parts of the cause of action.  *E.g.*, *Baral v. Schnitt*, 376 P.3d 604, 615 (Cal. 2016) (holding that California's statute can be utilized to challenge all or only part of a single cause of action, because a single cause of action may rely on multiple instances of conduct, only some of which may be protected).

2.      Section 7(a)(1) establishes "Phase One" of the motion's procedure—applicability.  In this phase, the party filing the motion has the burden to establish the Act applies for one of the reasons identified in Section 2(b).  To use the Act, a movant need not prove that the responding party has violated a constitutional right—only that the responding party's suit arises from the movant's constitutionally protected activity.  THOMAS R. BURKE, ANTI-SLAPP LITIGATION § 3.2 (2019).  Nor does the moving party need to show that the responding party *intended* to chill constitutional activities (motivation is irrelevant to the phase-one analysis) or prove that the responding party *actually* chilled the movant's protected activities.  *Id.*  But "[t]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-SLAPP statute.  Moreover, that a cause of action arguably may have been 'triggered' by protected activity does not entail it [as] one arising from such." *Navellier v. Sletten*, 52 P.3d 695, 708-09 (Cal. 2002).  Rather, the Act is available to a moving party if the conduct underlying the cause of action was "itself" an "act in furtherance" of the party's exercise of First Amendment rights on a matter of public concern.  *See City of Cotati v. Cashman*, 52 P.3d 695, 701 (2002).  The moving party meets this burden by demonstrating two things: first, that it engaged in conduct that fits one of the three categories spelled out in Section 2(b); and second, that the moved-upon cause of action is premised on that conduct.  *See id.*  In short, the Act's "definitional focus is not the form of the [non-movant's] cause of action but, rather, the [movant's] activity that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." *Navellier*, 52 P.3d at 711.

        In many instances, the moving party will be able to carry its burden simply by using the responding party's pleadings.  *See Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) ("When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more.").  As pointed out in Comment 2 to Section 6, a party is always free to use an opposing party's pleadings as stipulations and admissions, and when the Complaint spells out the cause of action and the activity underlying that cause of action, the moving party will be able to satisfy its burden rather easily.  For example, if a defendant is sued by a public official for defamation, and the Complaint identifies the allegedly defamatory statement made by the defendant, then the defendant should need to do no more than attach the Complaint as an exhibit to its motion—the Complaint itself would clearly demonstrate that the defendant is being sued for speaking out about a public official (undoubtedly a matter of public concern).

        In other instances, the moving party will have to attach evidence to its motion to establish that the cause of action is based on the exercise of protected activity.  That's because a creative

plaintiff can disguise what is actually a SLAPP as a "garden variety" tort action. "Thus, a court must look past how the plaintiff characterizes the defendant's conduct to determine, based on evidence presented, whether the plaintiff's claims are based on protected speech or conduct." BURKE, *supra* at § 3.4.

But the fact that the movant's burden must be carried with evidence—whether that be the responding party's pleadings or evidence the movant presents—does not mean the inquiry is a factual one. On the contrary, the motion is legal in nature, and the burden is likewise legal. Thus, the court should not impose a factual burden on the moving party—like "preponderance of the evidence" or "clear and convincing evidence"—typically seen in fact-finding inquiries. Rather, like other legal rulings, the court should simply make a determination, based on the evidence produced by the moving party, whether a cause of action brought against the moving party is based on its (1) communication in a legislative, executive, judicial, administrative, or other governmental proceeding; (2) communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or (3) exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, on a matter of public concern. It should do so without weighing the parties' evidence against each other, but instead by determining whether the evidence put forth by the movant establishes the legal standard. If the moving party fails to prove the Act applies, the motion must be denied.

3.      Section 7(a)(2) is also part of "Phase One" of the motion's procedure. Even if the Act applies for one of the reasons identified in Section 2(b), the Act may nevertheless *not* apply if the party against whom the motion is filed can establish the applicability of an exemption identified in Section 2(c). A party seeking to establish the applicability of an exemption bears the burden of proof on that exemption. Like establishing applicability under Section 2(b), the burden to establish *non-applicability* under Section 2(c) is legal, and not factual. The responding party may use the moving party's motion, or affidavits or any other evidence admissible in a summary-judgment proceeding, to carry its burden. And like the Section 2(b) analysis, the court should decide whether the cause of action is exempt from the act without weighing the evidence against that of the moving party, but instead by determining whether the evidence produced by the responding party establishes the applicability of an exemption. If the responding party so establishes, the motion must be denied. If the moving party proves the Act applies *and* the responding party *cannot* establish the applicability of an exemption, the court moves to "Phase Two" of the motion's procedure.

4.      Section 7(a)(3)(A) establishes "Phase Two" of the motion's procedure—prima-facie viability. Anti-SLAPP laws "do not insulate defendants from *any* liability for claims arising from protected rights of petition or speech. [They] only provide[] a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." *Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1157 (Cal. 2019) (emphasis original) (citations omitted). Phase Two (as well as Phase Three) is where that "weeding out" occurs.

In this phase, the party against whom the motion is filed has the burden to show its case has merit by establishing a prima-facie case as to *each* essential element of the cause of action being challenged by the motion. *See Baral v. Schnitt*, 376 P.3d 604, 613 (Cal. 2016) (holding

that a responding party cannot prevail on an anti-SLAPP motion by establishing a prima-facie case on any *one* part of a cause of action). The moving party has no burden in this phase. "Prima facie" means evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted. *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 376-77 (Tex. 2019) (prima-facie evidence "is 'the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true'"); *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002) ("[T]he plaintiff must demonstrate that the complaint is [ ] supported by a sufficient prima-facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.").

Precisely how the responding party carries its burden to establish a prima-facie case "will vary from case to case, depending on the nature of the complaint and the thrust of the motion." *Baral*, 376 P.3d at 614. But the responding party should be afforded "a certain degree of leeway" in carrying its burden "due to 'the early stage at which the motion is brought and heard and the limited opportunity to conduct discovery.'" *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 44 Cal. Rptr. 3d 517, 529 (2006) (citations omitted). California courts have "repeatedly described the anti-SLAPP procedure as operating like an early summary judgment motion." THOMAS R. BURKE, ANTI-SLAPP LITIGATION § 5.2 (2019). "[A] plaintiff's burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment." *Yu v. Signet Bank/Virginia*, 126 Cal. Rptr. 2d 516, 530 (Cal. Ct. App. 2002) (disapproved of on other grounds by *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism*, 413 P.3d 650 (Cal. 2018)).

Accordingly, all a responding party must do to satisfy its burden under Phase Two is produce evidence that, if believed, would satisfy each element of the challenged cause of action. A court may not weigh that evidence, but rather must take it as true and determine whether it meets the elements of the moved-upon cause of action. *Sweetwater Union High Sch. Dist.*, 434 P.3d at 1157. If the responding party cannot establish a prima-facie case, then the motion must be granted and the cause of action (or portion of the cause of action) must be stricken or dismissed. If the responding party *does* establish a prima-facie case, then (and only then) the court moves to "Phase Three" of the motion's procedure.

5.    Section 7(a)(3)(B) establishes "Phase Three" of the motion's procedure—legal viability. Even if a responding party makes a prima-facie showing under Section 7(a)(3)(A), the moving party may still prevail if it shows that the responding party failed to state a cause of action upon which relief can be granted *or* that there is no genuine issue as to any material fact and the party is entitled to judgment as a matter of law—in other words, that the cause of action is not *legally* sound. In this phase, the burden shifts back to the moving party. If the moving party makes a showing under Section 7(a)(3)(B), then the motion must be granted and the cause of action (or portion of the cause of action) must be stricken or dismissed. If the moving party does not make such a showing—and the responding party successfully established a prima-facie case in "Phase Two"—then the motion must be denied.

For example, a plaintiff desiring to build a "big box" store sues a defendant for tortious interference based on the defendant's efforts to organize a public campaign adverse to the plaintiff. The defendant moves to dismiss under the Act and establishes that the suit targets her

19

First Amendment activity on a matter of public concern. Thus, the motion moves to Phase Two. In that phase, the plaintiff is able to establish a prima-facie case on each essential element of its tortious interference cause of action. Thus, the motion moves to Phase Three. But in that final phase, the defendant shows that the claim is barred by limitations. In such an instance, the court must grant the motion, because the defendant showed itself to be entitled to judgment as a matter of law.

Although Phase Three uses traditional summary judgment and Fed. R. Civ. P. 12(b)(6) language, it does not serve as a replacement for those vehicles. On the contrary, summary judgment and other dismissal mechanisms remain options for defendants who cannot establish that they have been sued for protected activity. In other words, to get to Phase Three—and be entitled to the Act's sanctions under Section 10—a movant must first prevail under Phase One by showing the Act's applicability. But by employing a legal-viability standard, the Act recognizes that a SLAPP plaintiff can just as easily harass a defendant with a *legally* nonviable claim as it can with a *factually* nonviable one.

6.      Sections 7(b) and (c) recognize that a party may desire to dismiss or nonsuit a cause of action after a motion is filed in order to avoid the sanctions that accompany a dismissal under Section 10. Both sections serve to maintain the moving party's ability to seek attorney's fees and costs—even though the offending cause of action has been dismissed—because the filing of a motion under the Act is costly, and many plaintiffs refuse to voluntarily dismiss their claims until a motion has been filed. But a prudent moving party should take efforts to inform opposing parties that it intends to file a motion under the Act, so as to give them an opportunity to voluntarily dismiss offending claims before a motion is filed. Courts may take a moving party's failure to do so into account when calculating the reasonableness of the moving party's attorney's fees.

7.      Section 7(b) protects a moving party from the gamesmanship of a responding party who dismisses a cause of action after the filing of a motion, only to refile the offending cause of action after the motion is rendered moot by the claim's dismissal.

8.      Once a motion has been filed, a voluntary dismissal or nonsuit of the responding party's cause of action does not deprive the court of jurisdiction.

9.      State law should dictate the effect of a dismissal of only part of a cause of action.

**SECTION 8.  RULING.**  The court shall rule on a motion under Section 3 not later than

[60] days after a hearing under Section 5.

## Comment

State law and local customs of the jurisdiction should dictate the consequences for a court not complying with the timelines set forth in this section.

**SECTION 9.  APPEAL.**  A moving party may appeal as a matter of right from an order denying, in whole or in part, a motion under Section 3. The appeal must be filed not later than [21] days after entry of the order.

*Legislative Note:*  *A state should insert a time to appeal consistent with other interlocutory appeals.*

*This section may require amendment of a state's interlocutory appeal statute or court rule.*

### Comments

1.      "If the defendant were required to wait until final judgment to appeal the denial of a meritorious anti-SLAPP motion, a decision by this court reversing the district court's denial of the motion would not remedy the fact that the defendant had been compelled to defend against a meritless claim brought to chill rights of free expression.  Thus, [anti-SLAPP statutes] protect the defendant from the burdens of trial, not merely from ultimate judgments of liability." *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (superseded by statute on unrelated grounds as stated in *Fyk v. Facebook, Inc.*, No. 19-16232, 2020 WL 3124258, at *2 (9th Cir. June 12, 2020)).

2.      This section should not be construed to foreclose an interlocutory appeal of an order granting, in whole or in part, a motion under Section 3, if state law would otherwise permit such an appeal.

3.      This section is not intended to affect any separate writ procedure a state may have.

4.      This section is not intended to prevent a court from entering an order certifying a question or otherwise permitting an immediate appeal of an order that dismisses only part of a claim.

5.      A party who chooses not to interlocutorily appeal under this section should not be foreclosed from filing an ordinary, non-interlocutory appeal of a court's denial of a motion under Section 3 following the entry of a final, appealable judgment.

**SECTION 10.  COSTS, ATTORNEY'S FEES, AND EXPENSES.** On a motion under Section 3, the court shall award court costs, reasonable attorney's fees, and reasonable litigation expenses related to the motion:

(1) to the moving party if the moving party prevails on the motion; or

(2) to the responding party if the responding party prevails on the motion and the court finds that the motion was frivolous or filed solely with intent to delay the proceeding.

**Comments**

1.      The mandatory nature of the relief provided for by this section is integral to the uniformity of the Act.   States that do not impose a mandatory award upon dismissal of a cause of action will become safe havens for abusive litigants.  Without the prospect of having to financially reimburse a successful moving party, SLAPP plaintiffs will be able to file their frivolous suits in such states with impunity, knowing that, at worst, their claims will only be dismissed.  But because moving parties would be financially responsible for the expense of obtaining that dismissal, the effect of the abusive cause of action is nevertheless achieved.  The only way to assure a truly uniform application of the Act is to require the award of attorney's fees to successful moving parties.

2.      Nothing in this section should be construed to prevent a court, in appropriate circumstances, from awarding sanctions under other applicable law or court rule against a party, the party's attorney, or both.  For instance, many states have adopted court rules analogous to Fed. R. Civ. P. 11, and the constricted breadth of Section 10 should not act as a shield or restriction against the imposition of such sanctions where they would be otherwise warranted.

3.      The term "costs" includes filing fees, as well as other monetary amounts a state may define as a "cost."

4.      The term "attorney's fees" means the fees paid to the attorney to compensate for his or her time and effort in the prosecution or defense of the motion.

5.      The term "litigation expenses" means the hard costs an attorney incurs in the prosecution or defense of the motion. Typical expenses in a case can include copies and faxes, postage, couriers, expert witnesses, consultants, private court reporters, and travel.

**SECTION 11.  CONSTRUCTION.**  This [act] must be broadly construed and applied

to protect the exercise of the right of freedom of speech and of the press, the right to assemble

and petition, and the right of association, guaranteed by the United States Constitution or [cite to

the state's constitution].

**Comment**

Similar expressions of intent by states that their anti-SLAPP statutes be broadly construed have been pivotal to courts' interpretations of those statutes.  *See, e.g.*, *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (recognizing that the Texas Legislature "has instructed that the [statute] 'shall be construed liberally to effectuate its purpose and intent fully'"); *Briggs v. Eden Council for Hope & Opportunity*, 969 P.2d 564, 573 (Cal. 1999) ("The Legislature's 1997 amendment of [California's anti-SLAPP statute] to mandate that it be broadly construed apparently was prompted by judicial decisions . . . that had narrowly construed it. . . . That the Legislature added its broad construction proviso . . . plainly indicates these decisions

were mistaken in their narrow view of the relevant legislative intent.").

**SECTION 12.  UNIFORMITY OF APPLICATION AND CONSTRUCTION.**  In applying and construing this uniform act, consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it.

**SECTION 13.  TRANSITIONAL PROVISION.**  This [act] applies to a civil action filed or [cause of action] asserted in a civil action on or after [the effective date of this [act]].

**[SECTION 14.  SAVINGS CLAUSE.**  This [act] does not affect a [cause of action] asserted before [the effective date of this [act]] in a civil action or a motion under [cite to the state's current anti-SLAPP law] regarding the [cause of action].]

*Legislative Note:* A state should include this section if the state has an existing procedure for a special motion for expedited relief that is being repealed because this act replaces it.

**[SECTION 15.  SEVERABILITY.**  If any provision of this [act] or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this [act] which can be given effect without the invalid provision or application, and to this end the provisions of this [act] are severable.]

*Legislative Note: Include this section only if this state lacks a general severability statute or a decision by the highest court of this state stating a general rule of severability.*

**[SECTION 16.  REPEALS; CONFORMING AMENDMENTS.**

(a) . . .

(b) . . .

(c) . . . ]

*Legislative Note:*  *Section 9 may require amendment of a state's interlocutory appeal statute or court rule.*

*A state may need to amend its statutes or rules of civil procedure to prevent a motion under this act from being considered a first pleading or motion that waives a defense or precludes the filing of another pleading or motion.*

**SECTION 17.  EFFECTIVE DATE.**  This [act] takes effect . . . .